The appellant, Stanley King, was charged by four indictments: one charged the attempted first degree rape of J.B.; another charged the first degree burglary of J.B.'s residence; another charged the first degree rape of B.P.; and another charged the first degree burglary of B.P.'s residence. The indictments were consolidated for trial, and a jury convicted King of the four charges. He was sentenced to 20 years' imprisonment for his conviction for the attempted rape of J.B. and 10 years' imprisonment for his conviction for *Page 882 
burglary of J.B.'s residence, with said sentences to run concurrently. He was sentenced to life imprisonment for his conviction for the rape of B.P. and 10 years' imprisonment for his conviction for the burglary of B.P.'s residence, with said sentences to run concurrently. He was also ordered to pay restitution in the amount of $569.15.
In support of the charges of attempted rape of J.B. and burglary of her residence, the prosecution presented the following evidence. On March 8, 1986, J.B. and her daughter, who was afflicted with Down's Syndrome, resided in west Montgomery. After putting her daughter to bed, J.B. fell asleep on the couch in her den. She had left on at least five lights and the television. When she awoke at approximately 11:30 p.m., she saw a man kneeling over her. His face was first obscured by one of her capes over his head, and he was wearing white high-top tennis shoes, blue jeans, a gray sweat shirt, and a black jacket. The tennis shoes stood out in her mind because, less than two weeks prior to this incident, she had heard something outside and, upon investigation, had seen someone wearing jeans and shoes like the ones the man, who was in her den, was wearing. When she screamed and tried to get up, he tried to strangle her and, also, hit her in her face, knocking her back down on the sofa. Immediately, the cape fell from his head. Although all of her lights were out, she was able to see his face from the light generated by the television even though he had taken the bedspread from her bedroom and draped it over the television. She asked him why he was there, and he replied that he was there to rape her. He explained that he had been watching her and he had "wanted" her for some time. He then told her that he would kill her and her daughter, that he had killed before, and that he would have no problem killing them. J.B. struggled with him for approximately 15 minutes. During this time, her attacker warned her that he was going to stab her. Although J.B. did not actually see a weapon while they were struggling, she felt something in his pocket that felt like a gun. During the struggle, he removed J.B.'s panty hose and panties and unzipped his pants. He attempted to penetrate her vagina with his penis, but she managed to block him with her legs.
During this struggle, J.B. continuously asked him questions about males, guessing that he might have a negative attitude about women and attempting to divert his attention from that attitude. In response, he stated that his parents were dead, that his aunt did not love him, and that no one loved or cared about him. He also stated that he had escaped from prison. He still continued to threaten her, telling her, among other things, that if she did not open her legs, he was going to have to hurt her. When he asked her to kiss him and she refused, he warned, "This is causing me to hurt you now." At some point when J.B. stated, "Well, God loves you," her attacker responded to her conversation. She continued by asking, "Let me pray for you." Then, he stopped struggling with her, and J.B. "poured out prayers like [she] had never done before." Afterward, he got up and told her to call the police. He also said that he would be at 2816 Cleveland Avenue and would be dead by the time he was found.
After her attacker left, J.B. discovered that her lights were out because the bulbs had been unscrewed and that her phone had been unplugged. She also saw that the window in her daughter's room had been opened and its screen was off. Investigation revealed that the address given by the intruder did not exist.
On April 20, J.B. selected King from a photographic array. The following day, J.B. viewed a physical line-up where she asked that the individuals say, "I will kill you and your daughter." J.B. immediately recognized King's voice and, also, noticed that, when he repeated the requested phrase, a worried expression came over his face and his chest began pulsating.
In answer to this evidence, King employed the theory of mistaken identity. J.B. was vigorously cross-examined by defense counsel, in an effort to cast doubt on her identification. Moreover, King testified *Page 883 
that J.B.'s assailant could not have been him.
In support of the charges of the rape of B.P. and the burglary of her residence, the prosecution presented the following evidence. On April 18, 1986, at approximately 10:00 p.m., B.P. went to her residence, which she shared with her son, to pick up a change of clothes. She and her son had not stayed at the house for about a month, but had stayed with her mother because her house had been recently burglarized on two occasions. On the occasion of the second burglary, which occurred approximately one week prior to the instant incident, a window pane had been broken just enough to unlock the window, the window had been raised, a key to B.P.'s residence had been taken, and the phone had been unplugged.
While at the house, B.P. telephoned a male friend and was talking to him when she saw a tall shadow in her living room. The lights in the bedroom and hallway were on, but not those in the kitchen or living room. When she screamed, a man came from the kitchen toward her. He was wearing a pull-over shirt, blue jeans, and tennis shoes. He grabbed her, and she hit him with the phone. Then, he jerked the phone away from her, started choking her, and told her that if she did not stop screaming, he would kill her. She struggled with him into the kitchen, where he forced her onto the floor. During their struggle, he continuously kept one hand on her neck. When she resisted by keeping her legs closed, he warned that she had better open her legs, and every time she closed them, he would "tighten up" on her neck. He took off her pants and panties and unzipped his pants and pulled them down about his knees. Then, he engaged in sexual intercourse with her by forcible compulsion.
While the intruder was raping B.P., B.P.'s male friend, who had been talking with her on the telephone, appeared and called out her name. With his arm around her neck, the rapist pulled B.P. from the floor. Although he had not displayed any type of weapon, he warned her friend that he had a gun and would kill her. He was also still choking her. B.P.'s friend then backed away, and her attacker dragged her outside to the back fence. He was still trying to have sexual intercourse with her. Then, he saw a police car and loosened his grip just a little. B.P. took advantage of this and fled to the police car.
King was apprehended shortly thereafter and taken back to J.P.'s house, where she and her friend identified him as her assailant. Upon investigation, B.P. discovered that her back porch light, which she always left on, had been unscrewed and that there was no sign of any forced entry. Subsequently, King confessed to the rape of B.P. and the burglary of her residence. This confession corresponded significantly with the facts as related by B.P.
In response to this evidence, defense counsel first intimated, in his opening statement and during cross-examination of B.P., that B.P. had consented to having sexual intercourse with King. In fact, during her cross-examination, B.P. was asked the following:
 "Q. Is it not true, [B.P.], that you voluntarily had sex with Mr. Stanley King, didn't you?
". . .
 "Q. He didn't rape you at all, you asked him into your house and had sex with him?
". . .
 "Q. And your boy friend came by while you were in the process of having sex with him — sex with Stanley King and you yelled rape. Now, isn't that the real truth?"
King testified that B.P. had approached him several months prior to the alleged rape; that about three weeks prior, she had given him a key that opened the front and back doors of her house; and that, on the night in question, she had invited him in and, when her boyfriend appeared, she had yelled rape.
King contends that the court erred in consolidating the four indictments, by the authority of Ala.R.Crim.Proc.Temp. 15.3(b).[1] *Page 884 
Before ordering consolidation, the trial court must overcome the following three obstacles: (1) it must ensure that the offenses charged in the respective indictments could have been joined in a single indictment; (2) it must be satisfied that the joinder meets the requirements set out in Rule 15.3(a); and (3) it must be satisfied that the defendant will not be prejudiced within the meaning of Rule 15.3(d). See Decker,Joinder and Severance in Federal Criminal Cases: An Examinationof Judicial Interpretation of the Federal Rules, 53 Notre Dame Law. 147, 199 (1977). See also United States v. Park,531 F.2d 754, 760 (5th Cir. 1976). We interpret King's argument to focus on the trial court's determination of the latter two criteria.
The question of the propriety of joinder under Rule 15.3(a) is a question of law, subject to full appellate review. SeeUnited States v. Werner, 620 F.2d 922, 926 (2d Cir. 1980). However, the harmless error doctrine is applicable to misjoinder; misjoinder requires reversal "only if the misjoinder results in actual prejudice because it 'had substantial and injurious effect or influence in determining the jury's verdict.' " United States v. Lane, 474 U.S. 438,106 S.Ct. 725, 732, 88 L.Ed.2d 814 (1986) (quoting Kotteakos v.United States, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253,90 L.Ed. 1557 (1946)). In contrast, the granting of relief under Rule 15.3(d) lies within the discretion of the trial court and refusal to sever counts or defendants properly joined under Rule 15.3(a) will be reversed only if the defendant proves that the court's decision constituted a clear abuse of judicial discretion. See Werner; Decker, supra, at 168.
We find that the four offenses in this case were properly joined in accordance with Rule 15.3(a), because they "are of the same or similar character," Rule 15.3(a)(i). We, again, recognize the following, which was expounded in Jenkins v.State, 472 So.2d 1128, 1129 (Ala.Cr.App. 1985):
 "This ground of joinder has caused considerable difficulty because of the obvious danger of prejudice to the accused. C. Wright, Federal Practice and Procedure: Criminal 2d § 143 (1982):
 " 'Decisions applying the "same or similar character" test have generally failed "to provide criteria which would provide guidance as to the precise scope of this rule." The view seems to be gaining acceptance, however, that the most important consideration is whether evidence of one offense would have been admissible at a trial of the other offense.' Federal Practice at § 143."
Our review of the evidence leads to a finding that the evidence of the rape of B.P. and the burglary of her residence would have been admissible at a trial of the offenses against J.B., for it would have been relevant as identifying King as the perpetrator of the attempted rape of J.B. and burglary of her residence.[2] In reaching this conclusion, we are guided by alternate tests. One is whether the circumstances of the offenses "exhibit such a great degree of similarity that anyone viewing the two offenses would naturally assume them to have been committed by the same person." Brewer v. State,440 So.2d 1155, 1161 (Ala.Cr.App. 1983). The other is whether there is something "novel" or "peculiar" about the offenses that identifies them with the defendant. Id. at 1163. In applying the test that the offenses are "so similar to each other that they could be said to form a pattern identifying the accused,"id. at 1162, we find *Page 885 
the following review of illustrations offered by the case law to be helpful:
 "In Thomas [v. State, 409 So.2d 955 (Ala.Cr.App. 1981)], both robberies committed by the defendant occurred within a half-hour and at locations less than a mile apart. The defendant carried a pistol, and made the victims — both Auburn students — remain in the bathroom while he cased the apartments. The assailant had trouble detaching the telephone cords in both dwellings and took no change on either occasion. Our court had no difficulty finding a sameness or 'pattern' in the two offenses.
 "Similarly, in Lewis [v. State, 399 So.2d 907
(Ala.Cr.App. 1981)], the defendant's prior robberies of elderly females by grabbing their purses as they were returning from the grocery store after dark established a 'design' or 'signature' pointing to the accused.
 "In Hayes [v. State, 384 So.2d 623 (Ala.Cr.App. 1979), cert. quashed, 384 So.2d 627 (Ala. 1980)], the accused assaulted two young women at 3:00 a.m. near their own front doors, one as he was kissing her goodnight and the other as he was leaving after a 'friendly talk.' In both cases the assailant placed his hands around the women's backs and suddenly began to apply pressure to their necks.
 "Stanley [v. State, 57 Ala. App. 83, 326 So.2d 148
(1976)], dealt with two burglaries of the same house with the same tenant — five months apart. Likewise, McDonald [v. State, 57 Ala. App. 529, 329 So.2d 583 (1975), cert. quashed, 295 Ala. 410, 329 So.2d 596, cert. denied, 429 U.S. 834
[97 S.Ct. 99, 50 L.Ed.2d 99] (1976)], involved a judge who propositioned female litigants after calling them to his chambers, closing the door, and offering 'help' on legal matters pending before him.
 "The attacker in Hogue [v. State, 54 Ala. App. 682, 312 So.2d 86 (1975)], drove an orange car, stopped female drivers at mid-afternoon near the same exit on Interstate 59 to tell them their mufflers were not working, and then pulled a knife on them and demanded money.
 "The Mitchell [v. State, 45 Ala. App. 668, 235 So.2d 917 (1970)], assailant waylaid pre-teenage girls on their way to school by preying on their fears of his brown and white dog. Similarly, the McKenzie [v. State, 33 Ala. App. 7, 33 So.2d 484
(1946), cert denied, 250 Ala. 178, 33 So.2d 488
(1947)], defendant lured women to the same secluded spot on the pretense of looking for a lost bracelet. In Wilder, [v. State, 30 Ala. App. 107, 1 So.2d 317 (1941)], the thief managed to snatch women's purses in movie theaters by sitting next to them, then changing seats until he had a more advantageous position from which to steal their handbags."
Brewer, 440 So.2d at 1162-63.
In considering whether the instant offenses were committed in the same "novel" or "peculiar" manner, we find guidance in the following cases wherein the appellate courts have found this test to have been met:
 "In Nichols [v. State, 422 So.2d 804 (Ala.Cr.App. 1982)], the defendant was tried for rape and the State sought to introduce evidence of three prior rapes committed by him. All of the victims testified that their assailants spoke in a distinctively soft voice and tried to keep them from seeing his face, twice covering them with a pillow for this purpose. He also inquired whether the victims were hiding anything under their pillows, and he later robbed them.
 "In Smith [v. State, 409 So.2d 455 (Ala.Cr.App. 1981)], the court noted the peculiarity of a rapist's apologizing to his three victims and returning them to a place of safety after he had attacked them sexually. In Breen [v. State, 349 So.2d 113 (Ala.Cr.App. 1977)], the court commented on the novelty of the defendant's using sheet hems with green stitching to bind all of his victims."
Brewer, 440 So.2d at 1163.
We also find the case of Lawrence v. State, 441 So.2d 1021
(Ala.Cr.App. 1983), to be helpful. The factual question at issue was the identity of a rapist armed with a pistol and disguised with a ski mask. The *Page 886 
appellate court affirmed the trial court's admission of the evidence that, five or six months prior to the instant incident, and forty miles away, the appellant was observed trying to break into a house; that, at the time, he had a pistol holster on his person and a ski mask in his car; and that a pistol was found near where he had been prowling. In so holding, the court noted that this evidence had a tendency to prove that the appellant was the person who committed the subsequent rape. Likewise, in Primm v. State, 473 So.2d 1149
(Ala.Cr.App. 1985), the court ruled that evidence of the appellant's attacks on two other women was admissible in the prosecution of appellant for first degree rape to show common plan, scheme, or system and identity. The court based this ruling on its finding of the following "similarities and novelties," id. at 1156: (1) each incident involved women who were in Dothan on business: (2) each occurred in the early evening: (3) each occurred at a motel on the by-pass; (4) each woman identified the appellant as her assailant; (5) in each incident, the appellant forced himself into the victim's room just after she had opened the door; and (6) each time, the appellant had a gun.
In reviewing these prior instances where the appellate courts have applied the "strict test of similarity between the charged and non-charged offenses," Brewer, 440 So.2d at 1155, we hold that the four indictments were properly consolidated. We base this holding upon our finding of the concurrence of the following common features: (1) The assaults occurred within the immediate vicinity of each other and of King's residence, all within three minutes' walking distance; (2) they occurred in the late-night hours and six weeks apart; (3) the victims were black females, who lived with only a child and no spouse; (4) the assailant continuously attempted to strangle each woman and threatened to kill each; (5) he warned of inflicting harm to each victim with a weapon, but he never displayed any type of weapon; (6) in each incident, light bulbs were unscrewed at the residence; (7) the assailant of both women wore high top tennis shoes; (8) each victim gave the same physical description of her attacker; and (9) each victim was repeatedly adamant that King was her assailant. Moreover, from the facts that a key to B.P.'s residence was taken during the burglary of her residence one week prior to her rape and that her rapist gained entry to her locked residence without force, it can be reasonably deduced that the burglar in the first instance was also the rapist. From this deduction, we find the following additional facts to further identify B.P.'s attacker as J.B.'s assailant: During the burglary of B.P.'s residence, when her key was taken, her phone was unplugged and entry was gained through a broken window and, during the burglary of J.B.'s residence, her phone was unplugged and entry was gained through a window. Finally, the evidence offers the similarity that, in each incident, the woman and her residence had been previously watched by her assailant. These similarities afford the natural assumption that the instant offenses were committed by the same person.
Scrutinized individually, these circumstances are diminished to relative insignificance. However, analysis of each individual similarity rarely has a place in the process of determining the presence of an inference of identity.
 "[I]n practice it rarely occurs that the evidential mark [to support an inference of identity] is a single circumstance. The evidencing feature is usually a group of circumstances, which as a whole constitute a feature capable of being associated with a single object. Rarely can one circumstance alone be so inherently peculiar to a single object. It is by adding circumstance to circumstance that we obtain a composite feature or mark which as a whole cannot be supposed to be associated with more than a single object.
 "The process of construing an inference of identity thus usually consists in adding together a number of circumstances, each of which by itself might be a feature of many objects, but all of which together make it more probable that they coexist in a single object only." *Page 887 
Thomas v. State, 409 So.2d 955, 956-57 (Ala.Cr.App. 1981) (quoting 2 Wigmore, Evidence § 411 (Chadbourn rev. 1979)).
Moreover, we recognize that the evidence presents several glaring dissimilarities between the assault of J.B. and that of B.P. Yet, we expressly state that we have compared theentire circumstances surrounding both incidents and have considered the noted similarities only within the context of the evidence as a whole, as mandated by Ex parte Arthur,472 So.2d 665, 668-69 (Ala. 1985), and we find that the dissimilarities do not outweigh the similarities. The glaring dissimilarities arise not from any difference manifested or created by the assailant, but from the intervention of factors outside the assailant's control: in J.B.'s case, her insight and courage to confront her assailant and thwart his intent to rape her and, in B.P.'s case, the arrival of B.P.'s friend and the police.
Accordingly, we find the initial consolidation to have been proper, as a matter of law. See Crawford v. State,485 So.2d 391 (Ala.Cr.App. 1986) (wherein the court held that three indictments for first degree robbery were properly consolidated as offenses of "the same or similar character" on the evidence that the three robberies occurred at fast food restaurants in Birmingham and on the same day, that the robber was armed and ordered the victims to put all the money in a bag, and that the victims described his appearance in similar terms); Butler v.State, 439 So.2d 210 (Ala.Cr.App. 1983) (wherein the court held that the consolidation of two robberies was proper where, during each of the robberies, which occurred ten days apart, a black male was armed with a silver pistol and demanded money).
In upholding the initial joinder in this particular case, we emphasize that joinder under Rule 15.3(a)(i) has caused considerable difficulty, Jenkins v. State, and, frankly, has caused such here. Clearly, joinder of offenses on this ground puts the defendant in a position most vulnerable to prejudice. However, as we have held, we are convinced that consolidation was proper here. We caution that, while trial convenience and economy of judicial and prosecutorial resources are to be weighed as important considerations promoting joinder, Langhamv. State, 494 So.2d 910, 915 (Ala.Cr.App. 1986), the risk of inconvenience, loss of time, and wasteful duplication caused by multiple trials after reversal of a consolidated trial on the finding of misjoinder are also not to be forgotten.
King further contends that "it is inherently prejudicial to join crimes where there are separate facts, questions, participants and victims" and that his constitutional right to a fair and impartial trial was violated. In answer, we refer King to the following passage from Twelfth Annual Review ofCriminal Procedure: United States Supreme Court and Courts ofAppeals 1981-1982, 71 Geo.L.J. 339, 494-98 (1983), which was quoted in Holsemback v. State, 443 So.2d 1371, 1377-78
(Ala.Cr.App. 1983):
 "Although the risk of prejudice, either from the jury's perception of evidentiary spillover or transference of guilt, exists in any joinder of offenses or defendants, the trial court weighs that risk against the interest of judicial economy. In reviewing improper denial of severance claims, courts of appeals require that the defendant demonstrate that the trial court abused its discretion by showing that the failure to sever resulted in compelling prejudice. . . ."
King has clearly failed to meet this burden, for he has neglected to even allege any "compelling prejudice." By the nature of the evidence, i.e., simple and distinct, the separate verdict forms, and the trial court's instructions, we consider that it was easy for the jury to keep the evidence separate in their deliberations and, thus, that the danger of the jury's cumulating the evidence was substantially reduced. 2 W. LaFave and J. Israel, Criminal Procedure, § 17.1 (1984). In addition, the evidence supporting each indictment was strong when contrasted with King's defenses. Under these sets of facts, we cannot say that the trial court abused its discretion in denying King's motion to sever. *Page 888 
Accordingly, this cause is hereby affirmed.
AFFIRMED.
All Judges concur.
[1] King contends that those indictments arising from the incident with J.B. should not have been consolidated with those arising from the subsequent incident with B.P.; he does not argue that each first degree burglary indictment should not have been consolidated with the charge of the respective offense accompanying each burglary, attempted rape or rape.
[2] Clearly, the identity of J.B.'s assailant was in issue. SeeThomas v. State, 409 So.2d 955, 957 (Ala.Cr.App. 1981). This was not an occasion where the defendant merely denies that the incident ever occurred. See, e.g., Anonymous v. State,507 So.2d 972, 975 (Ala. 1987).