[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 94 
The appellant, Timothy John Yelder, was charged in separate indictments with three counts of rape, one count of sodomy, two counts of burglary in the second degree, and one count of burglary in the third degree. These charges were consolidated for trial, and the appellant was found guilty on all counts. The appellant was sentenced to life in prison on each count of rape, 40 years' imprisonment for the sodomy conviction, 20 years' imprisonment on each burglary in the second degree conviction, and 30 years' imprisonment on the conviction for burglary in the first degree.
The appellant was indicted in 1988 and was convicted in 1989. The appellant, in his brief, applies the new rules of criminal procedure in presenting his arguments. However, these new rules do not apply in his case. As stated in Rule 1.5, A.R.Crim.P.: "These rules shall govern all criminal proceedings commenced at or after 12:01 a.m., January 1, 1991." The commencement of criminal proceedings is defined in the committee comments as "the date of the accusatory instrument by which the case was initiated or 'commenced.' " Proceedings against the appellant were commenced prior to January 1, 1991. For purposes of the present appeal, the Alabama Rules of Criminal Procedure, Temporary govern the appellant's cause.
The state's evidence indicated that the first victim was raped on the night of March 19, 1988. She was in her home, around midnight, asleep in the living room, when she was awakened by the door to the room being kicked open. The individual who entered ran over to her, knocked her glasses off, and grabbed her from behind. The victim *Page 95 
screamed and her attacker told her that if she continued to scream he would kill her. The victim tried to get away and ran towards the bedroom. Her attacker followed her, pushed her to the floor, applied a lubricant to her vaginal area, and raped her.
The next rape occurred around midnight on April 28, 1988. The second victim was at a friend's home by herself, asleep in the den, when she was awakened by something being placed over her face. The something was the bathrobe that she was wearing. Her attacker asked her what she was doing there and the victim told him that she was watching the house for a friend. The victim then told her assailant about items in the house which he could take if he would leave. The victim and her attacker walked towards the bedroom. Once in the bedroom, the intruder started pulling off the victim's pants. A struggle ensued, and the intruder sat on top of the victim and forced her to have oral sex with him and then raped her.
The next rape occurred on May 22, 1988. The third victim was at her father's house asleep in front of the television when she was awakened by something being placed over her face. The intruder had placed her bathrobe over her face. He told her not to make any noise and then proceeded to rape her.
None of the victims could identify the appellant from a line-up. Samples of semen collected from the three victims were tested using DNA matching. These tests connected the appellant to all three rapes.
 I
First, the appellant argues that the trial court erred in allowing the consolidation of the seven counts so that they could be tried in one proceeding. The appellant was charged with three counts of rape, one count of sodomy, two counts of burglary in the second degree, and one count of burglary in the first degree. The appellant contends that these offenses should not have been consolidated for purposes of trial because, he argues, there is no indication that the assailant was the same individual. He further contends that he was prejudiced as a result of the consolidation.
Consolidation of separate indictments, so that the accused may be tried in one trial is specifically provided for in Rule 15.3, A.R.Crim.P.Temp. (now Rule 13.3, A.R.Crim.P.). This rule states:
 "(b) Consolidation. If a defendant has been charged in separate indictments, informations, or complaints, the court, on its own initiative or on motion of either party, may, not later than seven days prior to trial, order that the charges be tried together if the offenses could have been joined in a single indictment, information, or complaint. . . ."
". . . .
 "(d) Severance Grounds. If the court finds that by a joinder of offenses in an indictment, information, or complaint, or by consolidation for trial, as provided in this rule, a defendant or the state may be prejudiced to the extent that a fair trial cannot be afforded, the court shall order an election or separate trials of counts or charges or provide whatever other relief justice may require. . . ."
Consolidation of offenses is favored since it serves the important policy of:
 " '. . . trial convenience and economy of judicial and prosecutorial resources — considerations of particular weight when the Government and the courts have been placed under strict mandate to expedite criminal trials.' Moreover, 'the defendant may prefer the disadvantages of joinder to the harassment, delay, trauma, and expense of multiple prosecutions.' Disposal of all of the charges in a single prosecution may facilitate concurrent sentencing, and will avoid the possibility of the convicted defendant later being disadvantaged by having a detainer filed against him for offenses not tried."
LaFave and Israel, 2 Criminal Procedure § 17.1(b) (1984). See also Langham v. State, 494 So.2d 910 (Ala.Cr.App. 1986). There are opponents to the practice of consolidating offenses, see 74 Yale L.J. 553 (1965), and at least one state prohibits consolidation, see Gray v. State, 549 So.2d 1316 (Miss. 1989).
In Alabama, joinder of offenses is permitted if the offenses 1) share the same *Page 96 
or similar characteristics, or 2) involve the same conduct or connection in their commission, or 3) are part of a common scheme. See Rule 15.3(a), A.R.Crim.P.Temp. (now Rule 13.3(a), A.R.Crim.P.). See also Butler v. State, 439 So.2d 210
(Ala.Cr.App. 1983). "Joinder, and thus consolidation, is appropriate where the crimes are of similar character, meaning nearly corresponding, resembling in many respects, or having a general likeness. United States v. Werner, 620 F.2d 922, 926
(2d Cir. 1980)." Ex parte Hinton, 548 So.2d 562, 566 (Ala. 1989), cert. denied, 493 U.S. 969, 110 S.Ct. 419, 107 L.Ed.2d 383
(1989). The question is whether the offenses are of a same or similar character so that a person evaluating the crimes would believe that the offenses were committed by the same person. See King v. State, 518 So.2d 880 (Ala.Cr.App. 1987). Perhaps the most important consideration is the answer to the following question: If the offense were tried separately, would evidence of each offense be admissible in the trial for the other offense? See Nickerson v. State, 523 So.2d 504
(Ala.Cr.App. 1987); King, supra.
In King two charges of rape and two charges of burglary were consolidated for trial. This court upheld the consolidation, stating:
 "We base this holding upon our finding of the concurrence of the following common features: (1) The assaults occurred within the immediate vicinity of each other and of [the appellant's] residence, all within three minutes' walking distance; (2) they occurred in the late-night hours and six weeks apart; (3) the victims were black females, who lived with only a child and no spouse; (4) the assailant continuously attempted to strangle each woman and threatened to kill each; (5) he warned of inflicting harm to each victim with a weapon; (6) in each incident, light bulbs were unscrewed at the residence; (7) the assailant of both women wore high top tennis shoes; (8) each victim gave the same physical description of her attacker; and (9) each victim was repeatedly adamant that [the appellant] was her assailant."
King, 518 So.2d at 886.
In the instant cause, the offenses with which the appellant was charged shared similar characteristics. The instances all involved white females between the ages of 20 and 33. The offenses occurred within the same general area, within walking distance from each other, and within a nine-week period. Two occurred on the same street. In each instance the females were not married, and the assailant entered their houses from the rear. Each home had a privacy fence in the backyard where their assailants had gained entrance. Each offense occurred around midnight, and the assailant approached each victim from behind and tried to keep his victims from seeing his face by covering the victims' faces with articles of clothing that they were wearing. The victims all sustained minor injuries, and in each instance their attacker told them that he would kill them if they screamed. Each victim also stated that the male had a distinct voice and that he enunciated his words clearly. The victims each described their attacker as being slim, being between 5'7" and 6'0", and wearing jeans and white tennis shoes. None of the three victims heard a car leave after she was raped. In each instance it also appeared from the conversation with their assailant, that he had been watching them before he broke into their houses. The circuit court did not err in ruling that the offenses were correctly consolidated because they shared the "same or similar characteristics." Rule 15.3(a), A.R.Crim.P.Temp.
Furthermore, the appellant has failed to show that he was sufficiently prejudiced by the consolidation of the offenses. The Alabama Supreme Court in Ex parte Hinton, supra, upheld the consolidation of capital offenses, noting that the appellant had failed to show he suffered "compelling" prejudice. As the Court stated:
 "It is only the most compelling prejudice that will be sufficient to show the court abused its discretion in not granting a severance. A mere showing of some prejudice is not enough. [The appellant] can show no prejudice here, because the evidence of both crimes could have been presented with or without consolidation. No prejudice results where, as here, the jury *Page 97 
could easily have kept separate the evidence of the separate crimes."
Hinton, 548 So.2d at 566 (citations omitted).
Because the offenses shared sufficient similarities and because the appellant has failed to show sufficient prejudice, no error occurred in the consolidation of the seven offenses for trial.
 II
The appellant next contends that the trial court erred in denying his motion for change of venue because the extensive pretrial publicity resulted in his being denied a fair and impartial trial. The Supreme Court of the United States has held that if an impartial jury cannot be selected from the district where the crime occurred, then the court should transfer the case to another district where the jurors are free from bias. Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417,10 L.Ed.2d 663 (1963). In Groppi v. Wisconsin, 400 U.S. 505,91 S.Ct. 490, 27 L.Ed.2d 571 (1971), the United States Supreme Court held that any law that prevents an individual from seeking a change of venue, when circumstances have occurred which would effect his right to a fair and impartial trial, violates the Constitution of the United States.
In the summer before the appellant in this case was tried for the instant offenses, he had been tried and convicted in the same county of rape. There had been publicity during his first trial. The appellant filed a motion for change of venue or motion for a continuance prior to the start of the present case which was scheduled to begin several months after the first trial. The trial court continued the trial for approximately four months to allow some time to pass between the first trial and the present trial. The court also stated when it denied the motion for change of venue that there would be an extensive voir dire of the prospective jurors concerning any possible bias that they might have resulting from pretrial publicity.
In the instant case, 88 prospective jurors were in the venire. Of these 88 people, 21 stated that they had not heard anything about the case. The other 67 prospective jurors were individually questioned in depth by the court about their impartiality. Of the 67, 7 did express reservations about their ability to make an impartial decision, saying that they had been exposed to the facts of the case and that they felt that they could not be impartial. The trial court excused all seven of these jurors for cause. The remaining veniremembers stated that they believed they could base their decisions on the evidence presented at trial. A review of the voir dire examination shows that the trial court did everything possible to determine the effects of the pretrial publicity on the prospective jurors and to eliminate any prejudice to the appellant.
LaFave and Israel's treatise on Criminal Procedure lists several ways a court may overcome pretrial publicity prior to the jury selection: change of venue, a continuance, and extensive examination of the jurors during the jury selection. See LaFave and Israel, 2 Criminal Procedure § 22.2 (1984). The trial court in the instant case granted a continuance and conducted a very thorough voir dire concerning the effect of the pretrial publicity on the prospective jurors.
For the appellant to be entitled to a new trial based on pretrial publicity he must show that the publicity created a "significant possibility of prejudice." Williams v. State,601 So.2d 1062 (Ala.Cr.App. 1991). "The proper way to ascertain whether adverse publicity may have biased the prospective jury is through the voir dire examination." Thomas v. State,452 So.2d 899, 902 (Ala.Cr.App. 1984); Lopez v. State,415 So.2d 1204, 1208 (Ala.Cr.App. 1982).
In the instant case the majority of the jurors answered that they could not remember what they had heard about the case, only that they recognized the appellant's name. When an individual juror stated that he or she had remembered hearing specific facts about the case, the court asked what that individual had heard and asked whether he could set aside what he had heard and try the case on the facts presented at trial.
 " 'Our own cases have stressed the wide discretion granted to the trial court in conducting voir dire
in the area of pretrial publicity and in other areas of inquiry that *Page 98 
might tend to show juror bias. Particularly with respect to pretrial publicity, we think this primary reliance on the judgment of the trial court makes good sense. The judge of that court sits in the locale where the publicity is said to have had its effect, and brings to his evaluation of any such claim his own perception of the depth and extent of news stories that might influence a juror. The trial court, of course, does not impute his own perceptions to the jurors who are being examined, but these perceptions should be of assistance to it in deciding how detailed an inquiry to make of the members of the jury venire.' "
Parker v. State, 587 So.2d 1072, 1079 (Ala.Cr.App. 1991), quoting from, Mu'Min v. Virginia, 500 U.S. 415, 111 S.Ct. 1899,1906, 114 L.Ed.2d 493 (1991). (Emphasis added.)
The trial court did not err in denying the appellant's motion for a change of venue.
 III
The appellant also argues that the trial court erred in denying his Batson[1] motion after the jury had been selected. InBatson the Supreme Court of the United States held that prosecutors may not strike black venire members from a black defendant's trial because of their race or "on the assumption that black jurors as a group will be unable to impartially consider the State's case against a black defendant." "The United States Supreme Court further held that 'once the defendant makes a prima facie showing, the burden shifts to the state to come forward with a neutral explanation for challenging black jurors.' " Freeman v. State, 586 So.2d 1013
(Ala.Cr.App. 1991). The United States Supreme Court in Powers v.Ohio, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), recently expanded the Batson ruling to include white defendants who allege that blacks have been excluded from their jury because of race.
In the instant case the appellant maintains that the prosecutor's reasons for his strikes of black prospective jurors were not race-neutral. The prosecutor used 24 of his 32 strikes to remove blacks from the venire. The appellant's counsel made a Batson motion and the trial court asked the prosecutor to justify his strikes.
 "We have previously concluded that where a trial court has made no express finding that a prima facie case of discrimination has been established but nonetheless requires a prosecutor to explain its peremptory challenges, this court will consider such a finding to be implied and will proceed directly to evaluate the prosecution's explanations."
Sims v. State, 587 So.2d 1271, 1276 (Ala.Cr.App. 1991).
Two black individuals did sit on the jury. However, as we stated in Sims: "The fact that two blacks actually sat on the jury is not proof that no racial discrimination occurred."Sims, 587 So.2d at 1277.
The following reasons were given for the prosecutor's strikes of black veniremembers:
 Juror number 150 — A previous robbery conviction and failure to register as a felon.
 Juror number 106 — A previous conviction for possession of marijuana, a previous conviction for sale of marijuana, a previous conviction for leaving the scene of an accident, and a previous conviction for public intoxication.
 Juror number 111 — A previous conviction for assault, traffic violations, and a previous conviction for assault and battery.
Juror number 10 — Prosecuted for welfare fraud.
 Juror number 155 — A previous conviction of disorderly conduct and was wearing an earring.
 Juror number 43 — A previous DUI conviction and previous harassment and public intoxication convictions.
Juror number 100 — A previous theft conviction.
 Juror number 154 — Told the court that he had severe concentration problems and that he felt he would be unable to give the case the attention it deserved.
 Juror number 137 — Knew the defendant's family — they went to the same church. *Page 99 
Juror number 71 — Knew Mr. Wagstaff.[2]
 Juror number 134 — Indicated during the voir dire that the appellant might be guilty of some of the charges but not of others.
 Juror number 142 — He and his wife had discussed the case and at one point in questioning he said that he was not sure he could be impartial.
 Juror number 117 — Said that the appellant was a friend of her nephew's and that she would feel uncomfortable sitting on the jury.
 Juror number 151 — Not on the original juror list, but a review of criminal records showed that an individual with the same name and who was about the same age had a conviction for fraud and for receiving stolen property. Also indicated that she knew Mr. Wagstaff.
 Juror number 9 — Worked at County Market, where the district attorney had prosecuted an employee several weeks earlier who was found not guilty. Also appeared to be very responsive to questions made by the defense. Also repeated "Amen" after the court quoted the Bible.
 Juror number 72 — Answered the question posed about eyesight. Said she had not had eyes checked in over 2 years. Prosecutor felt this would affect the case because there were volumes of scientific information that the jury would have to look at. Answered questions very slowly and wore a button which said, "We care."
 Juror number 67 — Knew Mr. Wagstaff and had a problem with child at home.
 Juror number 124 — Said he couldn't try the case on a "clean slate" and appeared to have difficulty understanding the questions asked during voir dire.
 Juror number 149 — Was an ordained minister who was involved in prison ministry. Prosecutor felt she might identify with inmates. Also, when asked about guilt or innocence she answered in a different tone of voice, as if she was not being completely truthful.
 Juror number 82 — Was a special education teacher. Appeared to be hostile when answering questions about pretrial publicity.
 Juror number 132 — Her responses to questions concerning pretrial publicity indicated that she did not understand what was being asked. The prosecutor stated that he could not understand her and was concerned about her ability to understand the extensive evidence that would be presented. Also had several traffic offenses. Appeared to be very disinterested in the case.
 Juror number 23 — Indicated that she had heard that the residents of the area where the rapes had occurred were scared to be there during that time and had "gone crazy." Prosecutor stated that he felt she had overreacted and that he was concerned about characterization of the residents. She also was inconsistent with answers to questions asked during the voir dire.
 Juror number 89 — Prosecutor knew his son. Juror responded that he had been a member of civil rights organizations. Was also 78 years old and felt he would be unable to follow the case. Also had difficulty with his eyesight.
 Juror number 75 — Was hesitant in answering questions; had difficulty in speaking and was 69 years old and the prosecutor felt he could not give the attention which would be required for the extensive evidence.
As the Alabama Supreme Court recently noted in Ex parte Bird,594 So.2d 676, 681 (Ala. 1991), "A history of discriminatory strikes is relevant in assessing the strength of the defendant's prima facie case." The Montgomery County District Attorney's Office does have a history of Batson violations. SeeEx parte Bird and the cases cited therein. However, after a careful review of the reasons given by the prosecution for striking both black prospective jurors and white prospective jurors, we conclude that the strikes of black veniremembers were race-neutral. " 'An appellate court may reverse the trial *Page 100 
court's determination that the prosecutor's peremptory challenges were not motivated by intentional discrimination only if that determination is " ' "clearly erroneous." ' "Gaston v. State, 581 So.2d 548, 549 (Ala.Cr.App. 1991), quoting from Mitchell v. State, 579 So.2d 45, 50 (Ala.Cr.App. 1991). The prosecutor must articulate reasons which are related to the case. Williams v. State, 548 So.2d 501 (Ala.Cr.App. 1988), cert. denied, 489 U.S. 1028, 109 S.Ct. 1159, 103 L.Ed.2d 218 (1989).
The strikes of the prospective jurors who had prior convictions were race-neutral. Jackson v. State, 549 So.2d 616
(Ala.Cr.App. 1989); Ward v. State, 539 So.2d 407
(Ala.Cr.App. 1988). Those jurors who indicated that they had a preconceived view of the case that might affect their verdict were also correctly struck from the jury. Such a preconception supplies a valid race-neutral reason for a strike, which may rise to the level of a strike for cause. Weeks v. State,568 So.2d 864 (Ala.Cr.App. 1989), cert. denied, 498 U.S. 882,111 S.Ct. 230, 112 L.Ed.2d 184 (1990). A veniremember's indication that service on the jury would be a hardship is a valid race-neutral reason for striking that veniremember. Harvey v.State, 579 So.2d 22 (Ala.Cr.App. 1990). "The fact that a veniremember appears hostile or impatient is a valid reason for striking that juror." Mitchell, 579 So.2d at 47. The fact that a veniremember shows dissatisfaction with police is a valid race-neutral reason. Powell v. State, 548 So.2d 590
(Ala.Cr.App. 1988), aff'd, 548 So.2d 605 (Ala. 1989). The fact that an individual may not be able to keep track of the proceedings because of mental or physical impairment is a valid race-neutral reason for striking that juror. Nesbitt v. State,531 So.2d 37 (Ala.Cr.App. 1987). The fact that a veniremember knew one of the lawyers involved in the case is a valid race-neutral reason for striking that juror. Strong v. State,538 So.2d 815 (Ala.Cr.App. 1988). The fact that juror knew the defendant is a race-neutral reason for striking that juror.Harris v. State, 545 So.2d 146 (Ala.Cr.App. 1988). Race-neutral reasons must be based on the facts of the case.
We cannot say after a careful review of the record that there is any evidence of "disparate treatment" in the striking of black members of the venire and the striking of the white members of the venire. Sims, supra. The record reflects that two white jurors were struck for the same reason that the prosecution stated that he struck prospective black jurors number 89 and 75, i.e., the inability, primarily because of their ages, to comprehend the extensive evidence presented. Also a white juror was struck for the same reason the prosecution gave for striking prospective black jurors number 67 and 71, i.e., that the juror knew Mr. Wagstaff. One of the reasons given for striking juror number 149 was that she was involved in prison ministry. Prospective white juror number 153 was struck because her husband was a retired minister. Furthermore, there is no evidence that the prosecutor did not engage the black members of the venire in a meaningful voir dire.
While we do believe that some of the reasons standing alone, such as age, would be suspect, they were accompanied by legitimate race-neutral reasons, and, therefore, the strikes were valid. See Battle v. State, 574 So.2d 943
(Ala.Cr.App. 1990).
 " 'A finding of discrimination, or a finding of no discrimination, is a finding of fact. Anderson v. Bessemer City, 470 U.S. 564, 573 [, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518] . . . (1985). In a Batson context, the Supreme Court observed that because the trial judge's findings "largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference." Batson, 476 U.S. at 98, n. 21 [106 S.Ct. at 1724 n. 21]. . . . "[F]indings of fact shall not be set aside unless clearly erroneous, and regard shall be given to the opportunity of the trial court to judge the credibility of witnesses." Anderson, 470 U.S. at 573 [105 S.Ct. at 1511] . . ., quoting F.R.C.P. 52(a).' "
Owens v. State, 531 So.2d 22, 23 (Ala.Cr.App. 1987). (Emphasis added.) See also Scales v. State, 539 So.2d 1074 (Ala. 1988). As the United States Supreme Court recently stated inHernandez v. New York, 500 U.S. 352, 111 S.Ct. 1859, 1868, *Page 101 
114 L.Ed.2d 395 (1991): "In Batson, we explained that the trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal." The trial court's ruling was not "clearly erroneous." No reversible error occurred here.
The appellant further contends that the trial court erred in not allowing him to cross-examine the prosecutor concerning the reasons he gave for striking the black veniremembers. However, the record reflects that defense counsel never asked to cross-examine the prosecutor when the prosecutor was testifying as to his reasons. As Judge Tyson recently stated in Smith v.State, 590 So.2d 388 (Ala.Cr.App. 1991):
 "Neither Batson nor Branch [v. State, 526 So.2d 609
(Ala. 1987)] mandates that a defendant be given the opportunity to cross-examine jurors or other witnesses in order to establish that the State's reasons are based on sham or pretext. Although the list of evidence set out in Branch is not all-inclusive, our reading of the types of evidence allowed to show sham or pretext indicates that Branch does not encompass the cross-examination of jurors or allow a defendant to go behind a prosecutor's information to determine if such information was true. A trial court's Batson
findings largely turn on an evaluation of credibility. A prosecutor may strike from mistake as long as the assumptions involved are based on an honest belief and are racially neutral."
Smith, 590 So.2d at 390. See also Jackson v. State,593 So.2d 167 (Ala.Cr.App. 1991).
 IV
The appellant next contends that the trial court erred in allowing DNA (deoxyribonucleic acid)[3] evidence to be received into evidence. DNA profiling is the complex process of matching genetic codes. The Alabama Supreme Court describes the procedure for evaluating DNA as follows:
" 'Three commercial laboratories in the United States currently perform DNA analysis: Cellmark . . ., Lifecodes Corporation,[4] and Cetus Corporation. Both Cellmark and Lifecodes employ restriction fragment length polymorphism (RFLP) analysis in their DNA testing. RFLP analysis involves the following steps:
 " '(1) Extraction: DNA is removed from the specimen and "washed" with an organic solvent.
 " '(2) Fragmentation: the extracted DNA chain is then cut into fragments at specific sites by mixing it with a restriction enzyme.
 " '(3) Gel electrophoresis: the DNA is placed in a gel to which an electrical current is applied, causing separation of the fragments into bands according to their length.
 " '(4) Southern [transfer]: the DNA bands are transferred to a nylon membrane while retaining the same positions they previously occupied on the gel. The double-stranded bands are then treated with a chemical that causes them to separate into single strands.
 " '(5) Hybridization: genetic probes (DNA clones) are applied, which bind to a specific, complementary DNA sequence on the membrane; the excess probe is then washed off.
 " '(6) Autoradiography (or "autorads"): the membrane is exposed to an x-ray film and developed so that the DNA banding patterns and their lengths can be visualized. Finally, the autoradiography is interpreted by comparing the DNA print to another DNA sample to determine if they match based on band length.' "
Ex parte Perry, 586 So.2d 242 (Ala. 1991). See also Comment, DNAIdentification Tests and the Courts, 63 Wn.L.Rev. 903 (1988).
Our Supreme Court in Perry, recognizing the "possibility of error in the interpretation *Page 102 
and performance of [DNA] test[ing]," adopted the following three-pronged test, which must be met before DNA test results may be received into evidence.
 "I. Is there a theory, generally accepted in the scientific community, that supports the conclusion that DNA forensic testing can produce reliable results?
 "II. Are there current techniques that are capable of producing reliable results in DNA identification and that are generally accepted in the scientific community?
 "III. In this particular case, did the testing laboratory perform generally accepted scientific techniques without error in the performance or interpretation of the tests?"
Perry, 586 So.2d at 250. Prior to the admission of DNA testimony into evidence, a hearing outside the presence of the jury must be held to determine if the test has been met. Perry.
1. The Alabama Supreme Court held in Perry that "there is a theory, generally accepted in the scientific community, that supports the conclusion that DNA forensic testing can produce reliable results." Perry, 586 So.2d at 250, and cases cited therein. As the New York Supreme Court noted in People v.Castro, 144 Misc.2d 956, 545 N.Y.S.2d 985 (Sup.Ct. 1989):
 " 'There is nothing controversial about the theory underlying DNA typing. Indeed, this theory is so well accepted that its accuracy is unlikely even to be raised as an issue in hearings on the admissibility of the new tests. . . . the theory has been repeatedly put to the test and has successfully predicted subsequent observations. . . .' Thompson and Ford, DNA Typing: Acceptance and Weight of the New Genetic Identification Tests, 75 Virginia Law Review 45 at 60-61 (1989)."
Castro, 545 N.Y.S.2d at 989. Thus, the first prong of the test has been met.
2. Our Supreme Court also held in Perry that there are "current techniques that are capable of producing reliable results in DNA identification . . . that are generally accepted in the scientific community." Perry, 586 So.2d at 250. Thus the second prong of the test has been met.
3. Our main focus becomes the answer to the third prong. InPerry the Supreme Court states:
 "In this particular case, did the testing laboratory perform generally accepted scientific techniques without error in the performance or interpretation of the tests.
 In order to answer this question, we must make two inquiries. First, were the techniques used by the testing laboratory generally accepted in the scientific community? Second, was there error in the performance or interpretation of the tests?"
Perry, 586 So.2d at 250.
In the instant case, Dr. Kevin McElfresh, assistant director of forensics at Lifecodes, testified concerning the DNA testing done on the blood taken from the appellant and the blood recovered from the semen samples taken from the rape victims. Dr. McElfresh, testified about the procedures that Lifecodes uses when testing DNA samples. The state introduced the cases of People v. Wesley, 140 Misc.2d 306, 533 N.Y.S.2d 643
(Sup.Ct. 1988), and Andrews v. State, 533 So.2d 841
(Fla.App. 1988), review denied, 542 So.2d 1332 (Fla. 1989) to show the procedures used by Lifecodes. Not only were those cases introduced, but Dr. McElfresh testified in depth about the procedures followed by Lifecodes:
 "Q [Prosecutor] — Do you at Lifecodes then follow a particular protocol?
 "A [Dr. McElfresh] — Yes, sir, we have a very defined precise protocol.
 "Q — Have you described some of that for us in the course of what you have already said?
 "A — Yes. I have described the protocol, the eight steps, the seven steps that we have looked at and the parts of the actual test that I have shown you are the results of following that protocol.
 "Q — At Lifecodes do you follow that protocol in each and every DNA test procedure that you conduct?
"A — Yes, sir. *Page 103 
 "Q — Was that followed in all of the instances of both known and unknown samples in the Yelder cases that we are here about?
"A — Yes, sir.
 "Q — You talked about the Southern papers, is there more you can add about the findings of Ed Southern in regard to what we have described?
 "A — What I would add is that with respect to the Southern Transfer Technology, that technology is used in laboratories throughout the world.
 ". . . . "Q — Doctor McElfresh, you mentioned just a moment ago that it would be the same whether it's done at Lifecodes or some other laboratory; are there other labs that use similar procedures to those at Lifecodes?
 "A — The procedures used at Lifecodes are used in virtually thousands of labs. The differences are the probes that are used and the source of samples.
 "Q — Have you ever cross-checked the work done at Lifecodes with that from other labs?
 "A — Well, with respect to forensics in my laboratory, there is one other company in the United States that does a very similar type of testing, Cell-Mark Diagnostics. And in a specific case, the attorneys from Dayton, Ohio, brought samples to my laboratory after they had already been taken to Cell-Mark. They gave us — we took our part of the samples, Cell-Mark had already taken the very same sample, you could see where they cut part of the samples out and left their initials as part of the forensic procedure.
 "We then proceeded to do our test, as Cell-Mark did their test. And at trial, we had both come to the same answer, independently. In addition, —
"Q — In other words, they agreed with each other?
 "A — Yes, sir, exactly. In addition, we have participated now in three separate blind trial proficiency tests administered by the State of California.
 In the first test, we were sent 22 samples; we were able to get DNA from 16 of those samples that were real trauma samples taken from car wrecks, other things, similar to that where the source of the sample is known. So they sent us the samples coded. We had no idea what the source of the sample was. Our job is to isolate the DNA, and match it or not match it. From some of those samples, we got nothing. From the rest of the samples, 16 to be precise in the first case, we were able to match 11 of those samples. The rest were non-matches. And when we returned those results to the San Bernardino County Sheriff's Office, we were exactly correct. We made no mistake. In the second case of proficiency testing, 50 samples were sent to us. 32, we were able to isolate DNA from, we made 21 matches. The rest were non-matches, and we were exactly correct.
 "And we just received from the State of California this last fall, another 50 samples. In this case, we were able to make 47 DNA prints from those samples, we matched — again it was 32, I believe, and the bottom line is that we were exactly correct, we made no mistakes.
 "Q — In any of your experiments, have you ever reached a false conclusion as to identity?
"A — No, sir.
 "Q — Are you aware of any case in which DNA printing has led to a false conclusion, to identity, ever?
"A — No, sir, I'm not.
 "Q — And is your use of DNA printing to establish identity supported by publications?
 "A — Yes, sir, we have an extensive publication list. The last publication appeared in the February 1989 American Journal of Human Genetics, that contained the results of our population statistical studies, based on this technology, and as such was accepted by peer review scientific journals.
 "Q — Are there other controls that you use to monitor your test procedures and so forth?
 "A — In addition to the gel controls that I talked about, in each sample that we run, we run a known sample of human DNA, *Page 104 
cut with our particular pair of restriction enzyme scissors. In this case it is known as PST-1. We run a known human sample on every job that we run. We know exactly what the characteristics of that sample are, we know what the pattern looks like, we see it day in and day out, hundreds of thousands of times. And therefore, if something were to go wrong in the final analysis, no matter what happened before, we would see in that final result something that would tell us that things had gone wrong, and would tell us not to use those results as part of the test.
". . . .
 "Q — Doctor McElfresh, I think you covered this in the last question I asked you to some extent, but can you describe for the court what processes and procedures are used to ensure that there's no contamination or mistake of any type made in the execution of the eight steps that you have just described?
 "A — All right. To begin with, a very defined precise chain of custody is set up at Lifecodes. Each sample is given its own specific number with which it is tracked by, and its whereabouts maintained. So we have a precise way of identifying all the samples numerically.
 "We have a very precise protocol, as I indicated, in which the steps to ensure the quality of the test are outlined. All the reagents, including the agarose and the other things we purchase for use in our laboratory are tested first by our quality control labs to ensure that they in fact do precisely what they are supposed to do. We purchase only materials for our laboratory that come with their own quality control standard already done. They submit a quality control standard and the results of their test to us. We in turn duplicate them before we release any reagents to the laboratory.
". . . .
 "Q — Have your protocols and procedures and the actual facility where those protocols are carried out been examined by outside experts in the past?
". . . .
 "A — Yes, sir, our laboratory is open to scientists who visit for a number of reasons. . . . Our facilities have been reviewed by specifically Doctor Kenneth Kidd from Yale University, and Doctor David Houseman from MIT. . . ."
The record clearly establishes that the third prong of thePerry test has been met. Thus, evidence of the DNA matching was correctly received into evidence.
The appellant also contends that the trial court erred in allowing Dr. McElfresh to state "DNA population frequency statistics." "Determination of the probability of specimen match and estimation of population allele frequency distributions are two keys of DNA profiling requiring probabilistic and statistical analyses." Lorne T. Kirby,DNA Fingerprinting 149 (1990). In the instant case defense counsel, relying on a Minnesota case, objected to the population frequency evidence, stating that it was not admissible. The Alabama Supreme Court in Perry stated that population frequency statistics are not per se inadmissible. Prior to the admittance of population frequency statistics, however, the following three-pronged test must be satisfied.
 "I. Is there a theory, generally accepted in the scientific community, that supports the conclusion that DNA population frequency statistics, as above defined, can give reliable results?
 "II. Are there current techniques that are capable of producing reliable results in DNA population frequency statistics, as above defined, and that are generally accepted in the scientific community?
 "III. In this particular case, did the testing laboratory perform generally accepted scientific techniques without error in the actual performance or interpretation of the tests? (The same two inquiries required by this prong in regard to DNA matching evidence are also required for DNA population frequency statistics.)"
Perry, 586 So.2d at 250.
Our Supreme Court in Perry gave the following reasons for distinguishing between *Page 105 
evidence of DNA matching and population frequency statistical evidence. It stated:
 "There are both scientific/mathematical and legal reasons for distinguishing between the admissibility of DNA 'matching' evidence and the admissibility of DNA population frequency statistics. Stated simply, the evidence necessary to show a 'match' does not by itself indicate the frequency with which a given DNA pattern might occur statistically or might occur in a given population; to establish population frequency generally requires data on the relevant populations involved as well as data for the mathematical, statistical analysis."
Perry, 586 So.2d at 254.
The record reflects that Dr. McElfresh was questioned prior to the admission of the population frequency statistics. Dr. McElfresh stated that Lifecodes used the Hardy-Weinberg law and that this procedure for profiling DNA is generally accepted in the scientific community. "The Hardy-Weinberg law states that in a large random mating population, where no disturbances by outside influences such as mutation, migration, or selection exits, the relative proportions of the different genotypes remain constant from generation to generation." Kirby, supra, at 168; Wesley, supra. (This procedure was validated in Wesley.
The introduction of case law is a "common source of information establishing general acceptance." Kirby, supra at 195.) There was testimony in the case to satisfy the three-pronged test articulated in Perry.
However, our inquiry does not end here. Our focus now becomes the answer to the following question posed in Perry: Does the probative value of the evidence outweigh its prejudicial effect? The answer to this question is yes. The facts of the instant case clearly show that the identity of the assailant was at issue during the trial. None of the three victims could positively identify her attacker. Thus, the DNA evidence became the most compelling evidence in the present case.
The appellant's main contention on appeal concerning the admittance of the population frequency statistics is that there were no statistics for the Montgomery area. There was no objection raised at trial, thus, this objection concerning statistics for the Montgomery area is raised for the first time on appeal and is not correctly before this court. Snowden v.State, 574 So.2d 960 (Ala.Cr.App. 1990). However, the unavailability of statistical information on a certain area of the county should not render population frequency statistics inadmissible. The basic premise of statistics is the inferences drawn from random samples of population.
 "Basic statistical data are usually derived from samples drawn from large populations. A population is a collection of individuals having stated features in common, such as all Orientals in the United States. A simple random sample is a subset of individuals selected from a population using a random choice mechanism . . . which guarantees that all members of the population are equally likely to be chosen. . . .
 "The features of interest in a population, such as true average IQ, or the true proportion of a specific allele at a given locus, are called parameters, while statistics are numerical summaries of data such as means or standard deviations. The science of statistics is concerned with inferring information about population parameters based on sample statistics."
Kirby, supra, at 150. See also DNA Identification Tests and theCourts, 63 Wn.L.Rev. 903 (1988).
The appellant next contends that the DNA evidence was incorrectly received into evidence because the chain of custody for the blood samples was not established prior to their admission into evidence. The appellant maintains that the failure of the United Parcel Service (UPS) personnel to testify constituted a break in the chain of custody. This very issue was addressed by Judge Bowen in Snowden. Judge Bowen stated:
 "The lack of testimony by any UPS employee regarding receipt of the package . . ., shipment by air, or eventual delivery in New York, while admittedly a bigger gap in the chain of custody, also does not undermine the identity and integrity of the evidence in this case. Requiring each UPS *Page 106 
employee who handled the package to testify as to his part in the chain would be not only 'not practical,' see Blanco v. State, 485 So.2d [1217] 1219 [(Ala.Cr.App. 1986)], but also 'not necessary to insure the integrity of the evidence,' id.
 ". . . Testimony that he received a sealed package containing the very items that . . . had [been] placed in the package 'was sufficient to establish the authenticity of the evidence.' "
Snowden, 574 So.2d at 963.
Ms. Lorah McNally of Lifecodes testified that when she received the samples at Lifecodes, the packages were sealed. There was no evidence that the samples had been tampered with by UPS personnel. "Under the circumstances, the trial court could be 'satisfied that in reasonable probability the article has not been changed in any important respect [and] it [could] permit its introduction into evidence.' " Snowden, 574 So.2d at 965.
The failure of the UPS personnel to testify at trial did not render the evidence inadmissible.
 V
The appellant next argues that the trial court erred in allowing evidence of a collateral offense to be received into evidence. Evidence was presented at trial that the appellant had been convicted of raping a Montgomery woman on May 30, 1988. The appellant maintains that evidence of this collateral act was introduced at trial only for the purpose of showing the appellant's propensity to commit the crimes with which he is presently charged.
Generally, evidence of collateral acts is not admissible in the trial of a nonrelated offense. Primm v. State,473 So.2d 1149 (Ala.Cr.App. 1985); C. Gamble, McElroy's Alabama Evidence § 69.01(1) (4th ed. 1991). However, there are several well-recognized exceptions to this general rule. McElroy'sAlabama Evidence § 69.01(2 through 14). The most commonly relied on of the exceptions are to prove knowledge, intent, motive, and/or identity. McElroy's § 69.01.
When seeking to admit evidence of a collateral offense under the identity exception, the following must be established:
 "All evidence tending to prove a person's guilt of the now-charged crime may be said to identify him as the guilty person. However, the identity exception to the general exclusionary rule is much more specific in that it contemplates the situation where the now-charged crime was committed in a novel and peculiar manner and the state is allowed to show that the accused has committed other similar offenses, in the same novel and peculiar manner, in order to show him the perpetrator of the now-charged crime.
 "The identify exception to the general exclusionary rule only becomes applicable when the identity of the person who committed the now-charged crime is in issue."
McElroy's Alabama Evidence § 69.01(8).
The two major questions which must be answered to determine whether evidence of the collateral offense was correctly received into evidence under the identity exception, are (1) was the crime similar to the now-charged offense? and (2) was the identity of the person who committed the now-charged crime placed at issue? Staten v. State, 547 So.2d 607 (Ala. 1989); Exparte Darby, 516 So.2d 786 (Ala. 1987); Nicks v. State,521 So.2d 1018 (Ala.Cr.App. 1987), aff'd, 521 So.2d 1035 (Ala.), cert. denied, 487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 948
(1988); Copeland v. State, 455 So.2d 951 (Ala.Cr.App.), cert. denied, 455 So.2d 956 (Ala. 1984); Bighames v. State,440 So.2d 1231 (Ala.Cr.App. 1983); Nichols v. State, 422 So.2d 804
(Ala.Cr.App. 1982). The answer to both of the above questions is yes. In the instant case the collateral crime concerning which evidence was admitted at trial was a rape that occurred eight days after one of the now-charged offenses. The victim was in her house asleep when she was awakened by a hand on her face. The victim and her attacker struggled, and the assailant asked her for money. He became angry when he found out that she had only $35.00 in her purse. They struggled again, and the assailant removed the victim's pajama bottoms and raped her. The assailant *Page 107 
had entered the victim's house by way of a bathroom window. A print found on the window ledge of that window was identified as that of the appellant's. The victim's house was located in the same general area as those of the other rape victims. She also lived in a house surrounded by a privacy fence. The victim also stated that her attacker tried to conceal his identity, wore tennis shoes and blue jeans, and was slim in build. Like the other three victims, this individual did not hear any car drive off after her attack. Furthermore, she could not positively identify her attacker. "The collateral incident proved at trial was sufficiently similar to that which occurred in the instant case." Beavers v. State, 511 So.2d 951
(Ala.Cr.App. 1987).
Not only were the crimes similar but the identity of the assailant was placed at issue in the now-charged offenses. None of the three victims could positively identify their attacker. The admittance of evidence of the collateral offense under the identity exception was correct.
For the foregoing reasons, the appellant's convictions are due to be, and they are hereby, affirmed.
AFFIRMED.
All the Judges concur.
[1] Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69
(1986).
[2] The prosecution asked the court to question the jury about any possible relationship with Mr. Wagstaff. Mr. Wagstaff was known to be active in victim's rights and was seen in the courtroom prior to the jury selection.
[3] "DNA 'is an organic substance found in the chromosomes in the nucleus of a cell. It provides the genetic code which determines a person's characteristics.' Caldwell v. State,260 Ga. 278, 393 S.E.2d 436, 437 n. 1 (1990)." United States v. TwoBulls, 918 F.2d 56, 57 n. 1 (8th Cir. 1990).
[4] Lifecodes performed the DNA testing in the instant case.