Charles Wendell Snowden was convicted of burglary in the first degree and rape in the first degree. He was sentenced, upon a showing of three prior felonies, to concurrent terms of life imprisonment without parole under the Habitual Felony Offender Act. He raises two issues on this appeal from those convictions.
On July 26, 1988, a black male burglarized a residence in Montrose, Alabama, and raped N.M. The assailant fled on foot. The victim immediately reported the attack to the Fairhope police, who arrived within minutes. Soon thereafter, tracking dogs from the State prison at Atmore were brought to the scene. The dogs picked up a scent at a spot believed to be the intruder's point of exit, and they followed the scent through woods and fields for several hours, eventually leading the trackers to the residence of the defendant's mother. The defendant, who was inside taking a bath, was arrested.
The victim was taken to a physician in Fairhope who performed a "rape kit" examination, which included extracting blood, hair, and vaginal swabs from N.M. Pursuant to an order of the Baldwin Circuit Court, samples of blood, hair, and saliva were also taken from the defendant. Forensic serologists at Lifecodes Corporation in Valhalla, New York, performed a deoxyribonucleic acid (DNA) print analysis on the specimens. Their analysis revealed that the DNA present in known samples of the defendant's blood matched the DNA in semen stains found on the victim's shorts, panties, and vaginal swabs.
Dr. Michael Baird of Lifecodes testified that the specimens in this case were analyzed by probing five "regions" of the genetic material. He stated that there was a DNA "match" on each of these regions. Dr. Baird concluded that the "frequency of occurrence of the pattern seen with the five probes in this system simultaneously in the black population is approximately one in eleven billion," with a "minimum value" of one in 2.5 billion and a "maximum value" of one in 27 trillion.
The defendant claims that the DNA test results were inadmissible because the State failed to prove a proper chain of custody of the biological samples. He also contends that Dr. Baird's "mathematical probability" conclusions regarding the test results were inadmissible because the State did not establish (a) that Dr. Baird was an expert in mathematical probabilities, and (b) that the probability calculations were reliable and generally accepted in the scientific community. He further asserts that "the use of mathematical probabilities has no place in the criminal trial process." Brief of Appellant at 16.
 I
We find that the State did establish a sufficient chain of custody of the biological samples to allow the admission of the DNA test results.
Dr. Mitzi Childs, a physician specializing in obstetrics and gynecology, examined N.M. following the rape which occurred on July 26. She collected samples of blood and hair, as well as vaginal swabs and smears from the victim. The doctor handed each item to the attending nurse, Ty Baker. Ms. Baker labelled and sealed each item according to the instructions on the rape kit and then handed the rape kit to Officer Jean White of the Fairhope Police Department. Officer White placed the sealed rape kit in her refrigerator until July 28.
On July 27, Marcella Predmore, a registered nurse at Thomas Hospital in Fairhope, withdrew samples of blood, saliva, and hair from the defendant. Ms. Predmore labelled and sealed the samples, and gave them to Officer Jean White. Officer White also placed this sealed kit in her refrigerator until July 28, at which time she removed both the victim's rape kit and the samples collected from the defendant and took them to Elaine Scott, a criminalist specializing in forensic serology at the Department of Forensic Sciences laboratory in Mobile.
Elaine Scott received two sealed "packets" from Officer Jean White on July 28. Sometime later (the record does not indicate *Page 962 
when), Ms. Scott broke the seals, opened both packets, and performed several tests on the specimens. Ms. Scott detected the presence of semen on two vaginal swabs, on the panties, and on a pair of shorts collected from the victim. She made a cutting from the panties, stapled it to a card, and sealed it. She then resealed the packet containing the shorts, other items from the victim's rape kit, and samples that had been collected from the defendant. All these materials were packaged for shipment to Lifecodes Corporation in New York.
Ms. Scott did not remember whether she personally had packaged the materials for shipment after sealing them, or whether one of her assistants had done so at her direction. She testified that the package was "picked up at the laboratory by either Federal Express or United Parcel Service." There was no testimony regarding the date on which the package was shipped.
On August 11, Chris Aird, the evidence technician at Lifecodes Corporation, received a package shipped by United Parcel Service ("UPS") "next day air" service from Elaine Scott. He thought, but was not sure, that Don Lomeie, the shipping and receiving clerk, had handed him the package. Neither Don Lomeie nor any representative from UPS testified. The package was sealed when Aird received it. Mr. Aird broke the seal on the outer package and read the enclosed letter. He then broke the seal on each item inside the package, initialed and dated each item, and assigned each a Lifecodes identification number. The items he examined corresponded exactly to the items Elaine Scott had placed in the package. Aird then took all the items to the Lifecodes evidence room and locked the door as he left.
Deborah Vining, a senior forensic scientist at Lifecodes, retrieved these items of evidence from the Lifecodes evidence room where Chris Aird had placed them. She performed a DNA print test on each piece of evidence. Dr. Baird later reviewed the results of her tests.
The defendant raised at trial and argues as error on appeal the failure of the State to account for the evidence between the time it left Elaine Scott and the time it reached Chris Aird.
In Suttle v. State, 565 So.2d 1197 (Ala.Cr.App. 1990), a conviction for vehicular homicide was reversed because the State failed to account for the whereabouts of the blood samples taken from the accused during the four days between the time the samples were taken by a nurse and the time they were received by the State's forensic expert. This court observed:
 "The principles governing this issue were set forth in Ex parte Williams, 548 So.2d 518, 520 (Ala. 1989):
 " 'The purpose of the establishment of the chain of custody is announced in Ex parte Williams, 505 So.2d 1254 (Ala. 1987):
 " ' "The purpose for requiring that the chain of custody be shown is to establish to a reasonable probability that there has been no tampering with the evidence. Williams v. State, 375 So.2d 1257 (Ala.Cr.App.), cert. denied, 375 So.2d 1271 (Ala. 1979); Tate v. State, 435 So.2d 190 (Ala.Cr.App. 1983); Smith v. State, 446 So.2d 68 (Ala.Cr.App. 1983). 'The evidence need not negate the most remote possibility of substitution, alteration, or tampering with the evidence, but rather must prove to a reasonable probability that the item is the same as, and not substantially different from, the object as it existed at the beginning of the chain.' Slaughter v. State, 411 So.2d 819, 822 (Ala.Cr.App. 1981) (emphasis supplied)."
" '505 So.2d at 1255.
 " 'A showing that there was no break in the chain of custody is required to establish a sufficient predicate for admission into evidence. Ex parte Yarber, 375 So.2d 1231 (Ala. 1979), reversed on other grounds, 437 So.2d 1330
(Ala. 1983). The identification of the evidence and continuity of possession must be sufficiently established in order to assure the authenticity of the item, Ex parte Yarber, supra. *Page 963 
" 'This state employs two separate standards for testing the chain of custody — the weak link test announced in Sommer v. State, 489 So.2d 643 (Ala.Crim.App. 1986), and the missing link test announced in Mauldin v. State, 402 So.2d 1106
(Ala.Crim.App. 1981).
 " 'Where a weak link in the chain of custody is found, the weight and credit afforded the evidence, rather than its admissibility, is questioned. Sommer, supra. Where a break in the chain of custody, or a "missing link" in the chain of custody is shown, the admissibility is questioned, Mauldin, supra.'
 "With regard to specimens taken from the human body, it is also incumbent upon the prosecution to show that the specimen analyzed was in fact the specimen taken from the defendant. In such cases, '[t]he "chain of custody" involves the "necessity of proving where and by whom the specimen was kept and through whose hands it passed." J. Richardson, Modern Scientific Evidence, Section 13.14a (2d ed. 1974).' Gothard v. State, 452 So.2d 889, 890 (Ala.Cr.App.), cert. stricken, 450 So.2d 479 (Ala. 1984). See generally, A. Moenssens, F. Inbau and J. Starrs, Scientific Evidence in Criminal Cases
§ 1.18(2)(c) (3d ed. 1986). '[W]here the substance analyzed has passed through several hands the evidence must not leave it to conjecture as to who had it and what was done with it between the taking and the analysis.' Rodgers v. Commonwealth, 197 Va. 527, 90 S.E.2d 257, 260 (1955) (emphasis added)."
Suttle, 565 So.2d at 1198-1199.
In Moorman v. State, 574 So.2d 953 (Ala.Cr.App. 1990), also released this date, a conviction for vehicular homicide involving the chain of custody of a blood sample was affirmed "[d]espite the facts that two 'links' in the chain of custody did not testify and were only generally identified as a unit secretary and a person from the laboratory" who "picked up the sample." 574 So.2d at 956. Quoting the foregoing authorities and discussing in detail the requirements of a proper chain of custody, this court concluded:
 "[W]e find no 'break' in the chain of custody of the blood sample. The evidence and the totality of the circumstances in this case establish a reasonable probability of the identity of the blood sample and the integrity of the continuity of possession."
Id. at 956. The totality of the circumstances here also establishes a reasonable probability of the identity of all the specimens and their integrity throughout the testing procedure.
The failure of either Elaine Scott or "one of her assistants" to testify that she actually handed the packages to a UPS employee for shipping does not constitute a break in the chain of custody affecting the admissibility of the evidence. SeeBlanco v. State, 485 So.2d 1217, 1219 (Ala.Cr.App. 1986) ("[e]ven assuming, arguendo, that a break in the chain of custody occurred due to the failure of the secretary to testify that she mailed the envelope, such a break would not warrant a reversal. A minor break in the chain of custody goes only to weight and not admissibility"). Accord Law v. State,165 Ga. App. 687, 691-92, 302 S.E.2d 570, 574, affirmed,251 Ga. 525, 307 S.E.2d 904 (1983) (evidence sent from one crime lab to another via UPS admissible despite lack of testimony by person who arranged shipment with UPS).
The lack of testimony by any UPS employee regarding receipt of the package in Mobile, shipment by air, or eventual delivery in New York, while admittedly a bigger gap in the chain of custody, also does not undermine the identity and integrity of the evidence in this case. Requiring each UPS employee who handled the package to testify as to his part in the chain would be not only "not practical," see Blanco v.State, 485 So.2d at 1219, but also "not necessary to insure the integrity of the evidence," id.
Chris Aird's testimony that he received a sealed package containing the very items that Elaine Scott had placed in the package "was sufficient to establish the authenticity of the evidence." Id. See also McCray v. State,548 So.2d 573, 57576 (Ala.Cr.App. 1988) (when officer delivered *Page 964 
suspected drugs in sealed bag to toxicology lab, forensic chemist was properly allowed to testify to results of drug test, notwithstanding lack of testimony by person who actually received the bag at the lab); Jackson v. State,516 So.2d 726, 751-52 (Ala.Cr.App. 1985), remanded on other grounds, 516 So.2d 768 (Ala. 1986) (forensic serologist properly allowed to testify as to results of blood tests, even though person who delivered blood samples to serologist did not testify); Powell v. State, 47 Ala. App. 582,258 So.2d 923 (1972) (no missing link in chain when officer testified that he had delivered drugs in a sealed package to toxicology department and toxicologist testified that he had received package in sealed condition, even though there was no testimony of who had given package to toxicologist). The foregoing cases stand for the proposition that when each witness who does testify accounts for the integrity of the evidence and there is no contention that the evidence was contaminated or altered in any way, there is no error in the admission of the evidence even though one link in the chain does not testify. SeeLowery v. State, 452 So.2d 897, 899 (Ala.Cr.App. 1984).
In Miller v. State, 484 So.2d 1203 (Ala.Cr.App. 1986), this court observed that
 "[a]ppellate courts have 'consistently' rejected the argument that the 'failure of the evidence to follow a specimen through the mails every step of the way to the chemist's laboratory should be the basis for rejection of chemical test evidence' when the proof shows the specimen was placed in the proper type of sealed container so that the possibility of contamination during transit was eliminated."[1]
484 So.2d at 1204-05. The defendant asserts that Miller v.State, supra, mandates a reversal here because in that case this court stated that, while there is a presumption that items shipped via the United States Postal Service are delivered intact, this court knew of no such presumption for items shipped through "inter-agency" state mail.484 So.2d at 1205. The State suggests that we extend the Miller
presumption to mail transported via UPS.
While such an extension would not be unreasonable, it is unnecessary in this case. If the authenticity of the evidence could be presumed here, it was not because of the shipper's identity, but because the proof simply did not "suggest any real basis for concluding that [the packages] or their contents were different from those in the . . . package originally sent by [Elaine Scott] from [Mobile]." United States v.Rans, 851 F.2d 1111, 1114 (8th Cir. 1988).
In United States v. Rans, supra, an illegal shipment of cocaine was sent via Federal Express from Colorado to South Dakota. After several attempts to deliver the package to the named addressee proved unsuccessful, Federal Express employees followed company policy and opened the package "to seek further information regarding delivery." 851 F.2d at 1112. Officials at the Federal Express security office in Memphis instructed the South Dakota employees, who found what they believed to be cocaine inside the package, to repackage the evidence and send it to Memphis. The accused in Rans argued that a proper chain of custody was not proved because of a "gap" between the repackaging of the evidence in South Dakota and the receipt of the evidence in Memphis. *Page 965 
 "Defendant points out that the . . . packages left South Dakota in one blue bag and a box, but arrived in Memphis in two separate blue bags. Additionally, defendant notes the . . . package contained two white envelopes with two baggies each inside one larger manila envelope in [South Dakota], but contained four white envelopes with one baggie each and no manila envelope in Memphis.
 ". . . He claims . . . that there is clear evidence of tampering with the outer packages in which the baggies were placed, . . . which the government has not adequately explained. Conceding that government officials are entitled to a presumption of integrity, defendant emphasizes the alleged tampering occurred while the package was in the hands of Federal Express employees, not law enforcement or other government personnel."
United States v. Rans, 851 F.2d at 1114 (emphasis added). In resolving this issue, the Eighth Circuit Court of Appeals quoted from three federal cases, United States v.Roberts, United States v. Anderson, and United Statesv. Lane:
 "Tangible evidence of crime is admissible when shown to be 'in substantially the same condition as when the crime was committed.' United States v. Roberts, 844 F.2d 537, 549 (8th Cir. 1988); United States v. Gatewood, 786 F.2d 821, 825 (8th Cir. 1986); United States v. Anderson, 654 F.2d 1264, 1267 (8th Cir.), cert. denied, 454 U.S. 1127, 102 S.Ct. 978, 71 L.Ed.2d 115 (1981) (quoting United States v. Lane, 591 F.2d 961, 962
(D.C. Cir. 1979)). If the accused makes a minimal showing of ill will, bad faith, evil motivation, or some evidence of tampering, the government must establish that 'precautions were taken to maintain the evidence in its original state.' Roberts, 844 F.2d at 549; Gatewood, 786 F.2d at 825.
 "The undertaking on that score need not rule out every conceivable chance that somehow the identity or character of the evidence underwent change. " '[T]he possibility of misidentification and adulteration must be eliminated,' we have said, 'not absolutely, but as a matter of reasonable probability.' So long as the court is persuaded that as a matter of normal likelihood the evidence has been adequately safeguarded, the jury should be permitted to consider and assess it in the light of surrounding circumstances. Anderson, 654 F.2d at 1267."
United States v. Rans, 851 F.2d at 111213. Seealso Moorman v. State, 574 So.2d at 957 (citing with approval United States v. Roberts and UnitedStates v. Anderson). The court then concluded:
 "We are troubled by the evidence presented in this case. Nonetheless, the issue is whether the district court was properly satisfied that 'in reasonable probability the article has not been changed in any important respect.' While the evidence may raise questions about the handling of the outer packaging in which the four baggies were placed, it does not suggest any real basis for establishing that either the baggies themselves or their contents were different from those in the . . . package originally sent . . . from Denver. In fact, [a co-defendant] identified [the evidence] as the cocaine he sent in the . . . package. Under these circumstances, we cannot say the district court abused its discretion in admitting the cocaine."
United States v. Rans, 851 F.2d at 1114 (citations omitted).
In the present case, the defendant made no showing of "ill will, bad faith, evil motivation or . . . tampering" on the part of UPS. Unlike the situation in Rans, no
alteration of the packaging was shown or was attributed to the shipper. Under the circumstances, the trial court could be "satisfied that in reasonable probability the article has not been changed in any important respect [and] it [could] permit its introduction into evidence." Moorman v. State,574 So.2d at 957 (quoting United States v. McCowan,706 F.2d 863, 865 (8th Cir. 1983)). See also Law v. State,165 Ga. App. at 691-92, 302 S.E.2d at 574 (evidence sent from crime lab in Moultrie, Georgia, to crime lab in Atlanta, Georgia, via UPS admissible *Page 966 
over chain of custody objection when no one from UPS testified).
The failure of Don Lomeie, the Lifecodes shipping and receiving clerk, to testify that he gave the package at issue to Chris Aird, the Lifecodes evidence technician, also does not affect the admissibility of the evidence:
 "A minor break in the chain of custody goes only to weight and not admissibility. United States v. Clark, 732 F.2d 1536 (11th Cir. 1984) (failure of evidence custodian to testify that he received package in mail goes to weight and not admissibility); Sims v. State, 428 So.2d 162 (Ala.Cr.App. 1982) (failure of lab employee to testify that he accepted pistol allegedly used in crime and that he later gave the gun to lab analyst held not to warrant reversal)."
Blanco v. State, 485 So.2d at 1219. See alsoMcCray v. State, 548 So.2d at 575-76 (lack of testimony by one who received evidence at toxicology lab and kept it until it reached drug chemist did not affect admissibility of evidence).
 II
In Perry v. State, [Ms. 8 Div. 301, March 16, 1990] (Ala.Cr.App. 1990), this court upheld the admissibility of the DNA print analysis under the Frye test, see Fryev. United States, 293 F. 1013 (D.C. Cir. 1923), and the defendant does not take issue with the admissibility of the test results themselves. He does, however, argue that theinterpretation of the results, using population frequency statistics or mathematical probability calculations, should be per se inadmissible in a criminal trial.
We acknowledge that there is a diversity of opinion on this subject. Compare, e.g., State v. Schwartz,447 N.W.2d 422, 428-29 (Minn. 1989) (limiting the use of population frequency statistics because "there is a real danger that the jury will use the evidence as a measure of the probability of the defendant's guilt or innocence and that the evidence will thereby undermine the presumption of innocence, erode the values served by the reasonable doubt standard, and dehumanize our system of justice"); Tribe, Trial by Mathematics:Precision and Ritual in the Legal Process, 84 Harv.L.Rev. 1329, 1355-58 (1971) (disapproving probability evidence); Jaffee, Of Probativity and Probability: Statistics,Scientific Evidence, and the Calculus of Chance at Trial, 46 U.Pitt.L.Rev. 925 (1985) (same); with United States v.Gwaltney, 790 F.2d 1378, 1382-83 (9th Cir. 1986), cert. denied, 479 U.S. 1104, 107 S.Ct. 1337, 94 L.Ed.2d 187 (1987) ("[a]ny potential prejudice [arising from mathematical probability testimony] was not so pronounced as to render admission of the testimony an abuse of discretion, particularly in light of the [limiting] instruction given by the trial judge" and the lack of any suggestion by the prosecution that the statistics "could in any way be used to predict the 'odds' that [accused] was guilty"); State v. Pennell, 1989 WL 167430 (Del.Super. 1989) (unreported opinion) ("[t]he danger of misleading a jury, confusing the issues or of creating undue prejudice to the defendant is extremely great when probabilities in the nature of 1 in 100 billion are expressed. Thus, such probabilities should only be expressed if they are soundly grounded in statistics generated from assumptions that are not subject to serious dispute"); Andrews v.State, 533 So.2d 841, 850 (Fla.Dist.Ct.App. 1988), rev. denied, 542 So.2d 1332 (Fla. 1989) (population frequency statistics are not per se unreliable, but courts should "proceed with special caution" in admitting such evidence);State v. Washington, 229 Kan. 47, 622 P.2d 986, 995
(1981), modified on other grounds, State v. Hayes,239 Kan. 443, 720 P.2d 1049 (1986) ("[t]he percentage of [the] population possessing certain blood characteristics [is] 'reasonably within [the] expertise' of the forensic expert testifying to blood type analysis" and "[a]ttacks on the validity of the underlying statistics go to the weight of such evidence, not its admissibility"); People v. Wesley,140 Misc.2d at 331-332, 533 N.Y.S.2d at 659 (N.Y.Co.Ct. 1988) (approving use of population frequency statistics if only the "minimum value" figure is asserted).
We need not resolve the issue of whether population frequency statistics are per se inadmissible in Alabama criminal trials because *Page 967 
this question was never presented to the trial court. The defendant did not direct the trial court's attention to the claimed inadmissibility of all probability evidence per se; instead he made the following specific objections to Dr. Baird's probability testimony: (a) Dr. Baird was not shown to be an expert in "probabilities"; (b) the population frequency calculations to which Dr. Baird testified were not shown to be scientifically reliable or generally accepted in the scientific community; and (c) the data base from which Dr. Baird derived his population frequency statistics had changed since the time of the defendant's DNA print analysis and was constantly changing.
"The statement of specific grounds of objection waives all grounds not specified, and the trial court will not be put in error on grounds not assigned at trial." Ex parteFrith, 526 So.2d 880, 882 (Ala. 1987). The trial court is due to be upheld for overruling each of the specific objections made by the defendant.
The observation we made in Perry v. State, approving the admission of the DNA test, is — under the circumstances presented to us here — applicable to theinterpretation of the test results:
 " '[C]ourts will consider whether other scientists have written or published articles supporting the test, and whether any trade organization has recognized the test, as factors probative of the degree of acceptance of the test. Courts also consider whether other courts have admitted the novel scientific evidence. Further, courts are often accused of conducting "scientific nose-counting" to determine acceptability. Courts will almost always look to the statistical reliability of the test, where possible, in determining reliability.' "
Perry v. State, slip op. at 7 (quoting Williams,D.N.A. Fingerprinting: A Revolutionary Technique inForensic Science and its Probable Effects on CriminalEvidentiary Law, 37 Drake L.Rev. 1, 13-14 (1987)).
First, we find that because Dr. Baird was qualified by the State as an expert in "population genetics," he was qualified to testify about genetic "probabilities." The science of population genetics is, by definition, concerned with the study of the frequency with which certain genetic patterns are repeated in a given population. This discipline necessarily involves probability calculations. See generally People v.Wesley, 140 Misc.2d at 326-331, 533 N.Y.S.2d at 656-58; Sensabaugh, Biochemical Markers of Individuality, Forensic Science Handbook 338, 403 (R. Safestein ed. 1982) (quoted in State v. Joon Kyu Kim, 398 N.W.2d 544,552-53 (Minn. 1987) (Kelley, J., dissenting) ("interpretation of individualization typing results is intimately tied to population frequency statistics; without being provided the appropriate statistical information, the triers of fact have no rational basis for deciding the significance of a type-for-type match").
Next, we find that the trial court could reasonably conclude that Dr. Baird's population frequency calculations were scientifically reliable and accepted. In the present case, Dr. Baird testified, as he did in People v. Wesley, supra, that he was the co-author of a publication entitled "Human Population Genetic Studies of Five Hyper-variable DNA Loci." This publication documented the results of a two-year Lifecodes study "describ[ing] the population frequencies of some of the DNA probes that were used in this case." The court inPeople v. Wesley found this same publication and Dr. Baird's associated testimony, to be based upon reliable scientific principles which are generally accepted in the scientific community. That court observed:
 "The Human Gene Mapping Conference is a prestigious international organization of scientists that has adopted the responsibility of mapping the human genome. It meets every two years for the purpose of registering newly-discovered gene (allele) loci and probes and assigning names or numerical designations to them. Listing with the Human Gene Mapping Conference of a locus or a probe is equivalent to general acceptance thereof by the scientific community. *Page 968 
 "Dr. [Kenneth K.] Kidd, who has been extremely active in the Human Gene Mapping Conference, serving on many of its committees, Chairman of the DNA Committee for the next conference, and the scientist in charge of supervising the assignment of locus designation numbers, testified that all probes used by Lifecodes in its DNA Fingerprinting (i.e., all probes studied in [the above-named publication and used in the present case]) have been accepted, mapped and published by the Human Gene Mapping Conference."
People v. Wesley, 140 Misc.2d at 322-23,533 N.Y.S.2d at 653-54 (footnote omitted). See also Andrews v.State, 533 So.2d at 850 (Dr. Baird's population frequency calculations found to be reliable and generally accepted in the relevant scientific community).
Although Dr. Kidd did not testify in the present case and there was no evidence that Dr. Baird's methodology had gained acceptance by the Human Gene Mapping Conference, Dr. Baird testified that the methodology of and the calculations in the foregoing article, upon which his population frequency testimony was based, were reliable and generally accepted in the scientific community. The defendant made no specific challenge to this conclusion. Compare State v.Pennell, 1989 WL 167430 (Del.Super. 1989) (unreported opinion) (defense expert disputed the findings of the State's witness from Cellmark Corporation, another laboratory which performs DNA tests); People v. Wesley,140 Misc.2d at 329-30, 533 N.Y.S.2d at 657-58 (defense called another expert to challenge the premise and conclusions of Dr. Baird's study);Kelly v. State, 792 S.W.2d 579 (Tex.Cr.App. 1990) (same). Under the circumstances, the trial court could conclude that Dr. Baird's testimony was the subject of no real dispute, and that his calculations were reliable and generally accepted by the scientific community.
Finally, the fact that the Lifecodes data base, from which that company drew the statistics necessary to make its probability determinations, had changed since the time of the defendant's DNA test or was "constantly changing" was not a basis for finding Dr. Baird's conclusions unreliable. Dr. Baird testified that "the numbers change slightly . . . [a]nd the times where we have changed the data base to this point, the overall effect in the number has been relatively minimal." He also stated that a data base containing 832 individuals was "fairly large . . . for this kind of study."
The defendant offered no evidence to refute either of these statements, and evidence presented in other DNA cases supports Dr. Baird's testimony. See, e.g., Cobey v. State,80 Md. App. 31, 559 A.2d 391, 398 (App.), cert. denied,317 Md. 542, 565 A.2d 670 (Md. 1989) (a data base of 700 persons, "four experts said at trial, fell within generally acceptable scientific criteria. There was no expert testimony at trial contradicting the proposition that the data base supported the conclusion drawn. We think that the evidence presented by the State was sufficient to establish a basis for the reliability and admission of DNA fingerprinting").
We have examined the issues raised in the defendant's pro se brief. Those issues concern the alleged denial of the effective assistance of trial counsel and are totally without merit.
In our opinion, the defendant received a fair trial. The judgment of the circuit court is affirmed.
AFFIRMED.
All Judges concur.
[1] Although the defendant did not raise at trial the possibility of contamination during transit and no evidence was therefore elicited in that regard, we note that in Perry v.State, [Ms. 8 Div. 301, March 16, 1990] (Ala.Cr.App. 1990), this court observed that DNA is "highly resistant to many of the forces of nature and is particularly stable in dried specimens. Successful forensic D.N.A. tests have been conducted on evidentiary specimens that were more than four years old." See also People v. Wesley, 140 Misc.2d 306,325, 533 N.Y.S.2d 643, 655 (N.Y.Co.Ct. 1988), wherein the court observed:
"[E]nvironmental effects, such as heat, humidity, and ultraviolet light do not appear to have an adverse effect on the integrity of DNA and a DNA print test. . . .
". . . [N]either the testing procedure itself, nor any known environmental factor, nor anything else, can alter the DNA to give a false result. . . . [T]he dichotomy is only between a correct answer or 'no result' — never a false positive. . . . [T]his view appears to have gained general acceptance in the scientific community."