597 So.2d 1325 (1992)
Charlotte J. GREEN, individually and as Administratrix of the Estate of Curtis Green, Deceased
v.
ALABAMA POWER COMPANY, et al.
89-1577.
Supreme Court of Alabama.
February 28, 1992.
Rehearing Denied April 24, 1992.
*1326 John Emory Waddell, William M. Jackson and John Ronald Storey of Waddell, Jackson and Storey, Dothan, for appellant.
Patricia A. Hamilton and William P. Cobb II, Montgomery, Steadman S. Shealy, Jr. of Buntin, Cobb & Shealy, P.A., Dothan, for appellee Storer Cable Communications, Inc.
Peter A. McInish of Lee & McInish, Dothan, for appellee Town of Slocomb.
ADAMS, Justice.
Curtis Green was electrocuted when his head contacted a 7,200-volt power line owned and maintained by Alabama Power Company ("APCo"). Charlotte Green, administratrix of his estate, appeals from an adverse judgment based on a directed verdict in favor of Storer Cable Communications, Inc. ("Storer"), and on a jury verdict in favor of APCo and the Town of Slocomb, Alabama, in an action seeking damages for wrongful death. We affirm in part, reverse in part, and remand.
On June 4, 1988, Curtis Green and his employer, Dallas Hilliard, were moving a building through the Town of Slocomb. Mr. Hilliard drove the truck that carried the building, which was owned by the Town of Slocomb. Green rode on the roof of the building to lift wires and other obstacles over the roof.
Under the plaintiff's version of events, the accident occurred at the intersection of Court and Watson Streets, where the truck and building were halted by the lowest two of three wires spanning the intersection. The lowest wire was a television cable owned and maintained by Storer. Above the Storer cable was a 110-volt secondary line owned and operated by APCo. Above the 110-volt line was APCo's 7,200-volt power line.
David Faison, an eyewitness produced by the plaintiff, testified that both the 110-volt secondary wire and the Storer cable were lower than the peak of the roof. According to his account, Green, who was positioned on the gable of the roof, reached below the gable, grasped the Storer cable and placed it on top of the house. After thus moving the Storer cable, Green repeated the procedure in moving the 110-volt secondary wire. While in the process of handling the middle wire, according to *1327 Faison, Green "straightened up" and his head contacted the 7,200-volt APCo wire. Green's body came to rest with his feet tangled in the lower two wires.
On September 2, 1988, Charlotte Green sued APCo, Storer, and the Town of Slocomb. She alleged, inter alia, that APCo and Storer had negligently caused the wrongful death of her husband by installing and maintaining their respective wires at insufficient heights. She also alleged that the Town of Slocomb negligently permitted its building to be transported through an intersection at which there was insufficient clearance. At trial, which began on April 9, 1990, each defendant moved for a directed verdict at the close of the plaintiff's evidence. The trial judge denied the motions of APCo and the Town of Slocomb, but granted Storer's motion.
The remaining defendants presented evidence, over the objections of the plaintiff, that a urine sample taken from Green's body contained traces of cocaine. The defendants then presented the testimony of an "addictionologist," who attempted to show the extent to which the cocaine found in the urine sample may have influenced Green's behavior at the time of the accident. The jury returned a verdict for APCo and Slocomb, and the plaintiff appeals.
On appeal, Mrs. Green contends that the trial court erred in (1) directing a verdict for Storer; (2) admitting evidence of cocaine in the urine sample; (3) allowing the addictionologist to present his conclusions regarding the possible influence of cocaine on Green's behavior; (4) charging the jury that the plaintiff "had the burden of establishing her claims by a preponderance of the evidence"; and (5) denying the plaintiff's motion for a mistrial due to an alleged violation of the trial court's grant of her motion in limine.

I. Storer's Directed Verdict
At trial, Mrs. Green produced measurements made at the scene following the accident. They revealed that the peak of the house was 18 feet, 1 inch from the pavement. The Storer cable was 14 feet and ½ inch from the pavement. The distance between the APCo secondary line and the street was 17 feet, 2 inches. The distance between the Storer cable and the APCo secondary line measured 37½ inches.
Both the National Electrical Safety Code and Storer's own construction standards required a minimum distance of 18 feet between the street and the television cable. In addition, the National Electrical Safety Code required a minimum of 40 inches between the Storer cable and the APCo secondary wire.
Approximately one year before the accident, Storer had transferred its cable at the intersection from the pole that had previously supported it to a concrete pole owned and maintained by APCo. According to testimony, Storer attached the cable to the highest available "pre-drilled" hole on the concrete pole; however, the Storer employee who transferred the cable noted a "possible road clearance problem" and made notations to that effect on the blueprints for the transfer. There was also evidence that Storer did not contact APCo regarding the clearance problem or the inadequate distance between its cable and APCo's secondary line.
Storer concedes that it installed and maintained its cable at a height lower than that required by the National Electrical Safety Code. However, it contends here, as it did before the trial court, that Mrs. Green "has offered no evidence that Storer Cable's admitted transgression of the above regulations proximately caused Mr. Green's accident." We agree.
As this Court has often explained, "[t]he proximate cause of an injury is the primary moving cause without which it would not have occurred, but which, in the natural and probable sequence of events, produces the injury." City of Mobile v. Havard, 289 Ala. 532, 538, 268 So.2d 805, 810 (1972); see also, Mobile City Lines, Inc. v. Proctor, 272 Ala. 217, 130 So.2d 388 (1961); Smith v. Alabama Water Service Co., 225 Ala. 510, 143 So. 893 (1932).
A proximate cause issue is ordinarily a question of fact to be determined by a *1328 jury. Davison v. Mobile Infirmary, 456 So.2d 14 (Ala.1984); Sungas, Inc. v. Perry, 450 So.2d 1085 (Ala.1984); Hall v. Booth, 423 So.2d 184 (Ala.1982). It becomes a question of law, however, when "there is a total lack of evidence from which the factfinder may reasonably infer a direct causal relation between the culpable conduct and the resulting injury." Davison, 456 So.2d at 24; see also Graham v. Wal-Mart Stores, Inc., 529 So.2d 938 (Ala.1988).
In this case, the plaintiff concedes that the electrical current in the Storer cable, if any, was "very negligible"; therefore, "Curtis Green's electrocution was in no way caused by electrical current in Storer Cable's television cable." Brief of Appellant, at 33. Moreover, Mrs. Green produced evidence that it was customary for those engaged in the business of moving houses to station someone on the roof to raise low-hanging wires encountered during the move. The plaintiff's evidence also revealed that both the Storer cable and the 110-volt line were considerably lower than the peak of the house. Thus, there was no evidence from which to conclude that Green would not have been on the house but for the position of the Storer cable.
Furthermore, the plaintiff's eyewitness testified that Green had already successfully completed the procedure for raising the Storer cable, and was engaged only in moving the APCo secondary wire when the accident occurred. Under the plaintiff's own version of the facts, there was a complete absence of evidence from which a jury could reasonably conclude that the accident happened because of the position of the Storer cable. Consequently, Storer was entitled to a judgment as a matter of law. The judgment is, therefore, affirmed as to Storer.

II. Evidence of Cocaine in the Urine Sample
More troubling, however, is the trial court's admission of evidence of the presence of cocaine in a urine sample taken from Green's body after the accident. In order to prove that Green's death resulted, at least in part, from his own negligent or inappropriate behavior, APCo and Slocomb presented the testimony of Dr. Alfredo Perades, of the Alabama Department of Forensic Sciences, and Laura Shevlin, a toxicologist. The plaintiff contends that the evidence of the presence of cocaine was inadmissible because, she says, the defendants failed to demonstrate an unbroken chain of custody of samples of body fluids, which were allegedly drawn by Dr. Perades, sent to the Alabama Department of Forensic Sciences in Auburn, and analyzed by Ms. Shevlin. We agree.
This Court recently set forth the following principles governing review of chain-of-custody issues:
"The purpose of the establishment of the chain of custody is announced in Ex parte Williams, 505 So.2d 1254 (Ala.1987):
"`The purpose for requiring that the chain of custody be shown is to establish to a reasonable probability that there has been no tampering with the evidence. Williams v. State, 375 So.2d 1257 (Ala.Cr.App.), cert. denied, 375 So.2d 1271 (Ala.1979); Tate v. State, 435 So.2d 190 (Ala.Cr.App.1983); Smith v. State, 446 So.2d 68 (Ala.Cr.App.1984)." The evidence need not negate the most remote possibility of substitution, alteration, or tampering with the evidence, but rather must prove to a reasonable probability that the item is the same as, and not substantially different from, the object as it existed at the beginning of the chain." Slaughter v. State, 411 So.2d 819, 822 (Ala.Cr.App.1981) (emphasis supplied)."
"505 So.2d at 1255.
"A showing that there was no break in the chain of custody is required to establish a sufficient predicate for admission into evidence. Ex parte Yarber, 375 So.2d 1231 (Ala.1979), reversed on other grounds, 437 So.2d 1330 (Ala.1983). The identification of the evidence and continuity of possession must be sufficiently established in order to assure the authenticity of the item, Ex parte Yarber, supra.

*1329 "This state employs two separate standards for testing the chain of custodythe weak link test announced in Sommer v. State, 489 So.2d 643 (Ala.Crim.App.1986), and the missing link test announced in Mauldin v. State, 402 So.2d 1106 (Ala.Crim.App.1981).
"Where a weak link in the chain of custody is found, the weight and credit afforded the evidence, rather than its admissibility, [are] questioned. Sommer, supra. Where a break in the chain of custody, or a `missing link' in the chain of custody is shown, the admissibility of the evidence is questioned, Mauldin, supra."

Ex parte Williams, 548 So.2d 518, 520 (Ala.1989) (emphasis in original).
In this case, evidence regarding the drawing and disposition of the samples of body fluids was provided by Dr. Perades and Ms. Shevlin. Because we conclude that a break in the chain of custody of the samples appears in the record in connection with Dr. Perades's preshipment procedures, we set out in toto those portions of his testimony regarding his role in the disposition of the samples.
"Q. [Counsel for APCo] I noticed from looking at your report that you submitted some evidence to the Department of Forensic Sciences in Auburn at that laboratory, is that correct?
"A. Yes, sir.
"Q. Did you take any samples from the body of Mr. Curtis Green?
"A. Yes.
"A. I removed eye fluid, bile, and urine.
"Q. And did you submit those samples to the Department of Forensic Sciences in Auburn in containers provided and used by the State of Alabama?
"A. Yes.
"Q. And you sent the samples to Auburn, is that correct?
"A. Yes, sir.
"Q. Why did you send those samples to Auburn?
"A. That's our toxicology lab in Auburn for this area.
"Mr. Cobb: I believe that's all.
"....
"Q. [Counsel for Mrs. Green] Dr. Perades, you said that various samples were taken and sent to Auburn?
"A. Yes, sir.
"Q. Who drew those?
"A. I did
"Q. You, yourself, drew them?
"A. Yes."
(Emphasis added.) As the record indicates, the only evidence regarding the manner in which the samples were handled in preparation for shipping was provided in response to a leading question by counsel for APCo on direct examination.
The defendants then called Ms. Shevlin, who was on the receiving end of the shipment. She provided the following testimony:
"Q. [By counsel for APCo] All right. Ms. Shevlin, did you receive at the Department of Forensic Sciences lab in Auburn containers that were labeled as being the blood and urine specimens of Curtis Green?
"A. Yes. I received a plastic bag which contained specimens of blood, the eye fluid, bile, and urine, each labeled as being that of Curtis Green and with the case number.
"Q. With the case number?
"A. Right.
"Q. And was that case number the case number assigned by the Department of Forensic Sciences in Dothan?
"A. Yes.
"Q. And by what means did you receive those plastic bags?
"A. They were received in a styrofoam carton sealed inside a cardboard carton; it was a unit that comes that way. They were shipped by U.P.S. and received at our lab in a sealed cardboard container.
"Q. Anywhere on that package did it indicate where the containers and where the samples had been sent from?
"A. No. Normally, U.P.S. removes a portion of their mailing label at the time of delivery, so, we don't actually *1330 see that part of it, but the paperwork that I have here was inside the box.
"Q. What did the paperwork reveal?
"A. The paperwork indicatedwas signed by Dr. Perades indicating shipment by U.P.S. on June 7, 1988.
"Q. What date did you receive those samples?
"A. I received them June 8, 1988, at 9:30 in the morning.
"Q. And is that the customary and normal handling or way that the Department of Forensic Sciences handles the shipment of body fluids such as blood and urine from one lab to the other?
"A. This is the way that we handled it between the Dothan lab and the Auburn [lab] for several years now.
"Q. Was the container that you received these samples in, in any way damaged before you opened it?
"A. Not from my observation, no.
"Q. Did it look like it had been tampered with in any way since the time it was shipped from Dothan?
"A. No.
"Your Honor, I've laid the predicate [for admission of the toxicology report].
"Q. [Cross-examination by counsel for Ms. Green] Ms. Shevlin, you know it was received at your lab in the sealed container?
"A. Yes.
"Q. And you know it was properly taken care of at your lab?
"A. Well, I would have been the one that opened it.
"Q. And there is no question about that, but you don't know what happened before that time do you?
"A. No.
"Q. As to who put it in that container?
"A. No, I don't.
"....
"Q. As to who turned it over to U.P.S.?
"A. No.
"Q. As to the procedure whereby U.P.S. received it?
"A. No. That information might be available from one of the people through the Dothan lab but I don't have it.
"Q. Or where it might have beenthe state of the substances from the time they were taken and the time they were put in the hands of U.P.S.? You don't know that either, do you?
"A. No. I know that the Dothan lab submits their specimens inside the cardboard boxes and that they do send cooling packs in the boxes also.
"Q. But as far as between the time it was taken and the time it was turned over to U.P.S., you don't have any personal knowledge of that?
"A. No."
(Emphasis added.)
Information absent from Dr. Perades's testimony was not supplied by the testimony of Ms. Shevlin. On the contrary, the package that she received contained samples not only of eye fluid, bile, and urine, but of blood. Thus, her testimony not only failed to supply vital information missing from Dr. Perades's account of the preshipment disposition of the samples, but, also injected an additional element of uncertainty.
In support of their contentions that the evidence was admissible, the defendants cite Snowden v. State, 574 So.2d 960 (Ala.Crim.App.1990), and Moorman v. State, 574 So.2d 953 (Ala.Crim.App.1990). In Snowden, the alleged break in the chain of custody of biological samples extracted from a rape victim and her alleged assailant occurred under the following circumstances:
"Elaine Scott [forensic serologist] received [in Mobile] two sealed `packets' from Officer Jean White [in Fairhope] on July 28. Sometime later (the record does not indicate when), Ms. Scott broke the seals, opened both packets, and performed several tests on the specimens. Ms. Scott detected the presence of semen on two vaginal swabs, on the panties, and on a pair of shorts collected from the victim. She made a cutting from the panties, stapled it to a card, and sealed it. She then resealed the packet containing the shorts, other items from the *1331 victim's rape kit, and samples that had been collected from the defendant. All these materials were packaged for shipment to Lifecodes Corporation in New York.
"Ms. Scott did not remember whether she personally had packaged the materials for shipment after sealing them, or whether one of her assistants had done so at her direction. She testified that the package was `picked up at the laboratory by either Federal Express or United Parcel Service.' There was no testimony regarding the date on which the package was shipped.
"On August 11, Chris Aird, the evidence technician at Lifecodes Corporation, received a package shipped by United Parcel Service ("UPS") `next day air' service from Elaine Scott.... The items he examined corresponded exactly to the items Elaine Scott had placed in the package."
Id. at 961-62 (emphasis added). The Court of Criminal Appeals concluded that "the totality of the circumstances" sufficiently established the "continuity" of the chain of custody and the "integrity" of the procedure. Id. at 963.
In Moorman, it was alleged that the following circumstances constituted a break in the chain of custody of a blood sample drawn from the defendant charged with vehicular homicide:
"The injured defendant was taken to the East Alabama Medical Center. Wanda Johnson, a registered nurse on duty in the emergency room, testified that between 3:30 and 4:00 that afternoon she simultaneously drew at least three blood samples from the defendant for `diagnostic purposes' and for `legal purposes.' Each sample was placed in a prepackaged tube and each tube had a different colored top.... She did testify that she sealed each tube and identified each sample with the defendant's name and hospital number. She then gave one sample to Opelika police detective John Richardson. She gave the other samples to the `unit secretary to be sent to the lab.' She testified that `[s]omebody from the lab picked it up.' Johnson testified that tests for the emergency room were `automatically done stat [as soon as possible.].' Neither the unit secretary nor the person from the laboratory who picked up the sample testified at trial.
"Jane Trip was the `toxicology coordinator' for the hospital laboratory.... She tested the one sample of the defendant's blood she received from `laboratory personnel.' This sample had a red and grey speckled top and appeared to be `intact.' She testified that the information on the sample container indicated that the sample had been taken at 3:30 p.m."
Moorman, 574 So.2d at 954-55. Notwithstanding the fact that "two `links' in the chain of custody did not testify and were only generally identified as a unit secretary and a person from the laboratory," the Court of Criminal Appeals found that the "totality of the circumstances ... establish[ed] a reasonable probability of the identity of the blood sample and the integrity of the continuity of possession." Id. at 956.
The factual distinctions between those cases and the one under consideration are apparent. Unlike the record in Moorman, which indicated precisely when the blood samples were taken, the record in the case before us merely reveals a four-day period, any part of which could have constituted the time of the extraction. Unlike the records in Snowden and Moorman, which set forth in detail the procedures employed in labeling and sealing the individual samples, the record in this case reveals only that Dr. Perades "submit[ted] those samples to the Department of Forensic Sciences in Auburn in containers provided and used by the State of Alabama." It reveals nothing whatever of the procedures employed in drawing the samples, whether or when the samples were sealed, or when they were labeled and shipped. Finally, unlike Moorman, which involved a very short time span between the drawing and the testing of the samples, this case involves an interval of undetermined duration spanning, perhaps, several days. The interval between the sealing, labeling, and *1332 shipping of the samples involved in Snowden was also of uncertain duration; however, unlike the discrepancy involved in this case, the items that arrived in New York "corresponded exactly" to those that Elaine Scott had packaged. We find no support, therefore, in those cases for the defendants' contentions.
In chain-of-custody cases involving "specimens taken from the human body," the proponent of the evidence must demonstrate "`where and by whom the specimen was kept and through whose hands it passed.' J. Richardson, Modern Scientific Evidence, Section 13.14a (2d ed. 1974). Gothard v. State, 452 So.2d 889, 890 (Ala.Cr.App.), cert. stricken, 450 So.2d 479 (Ala.1984)." Suttle v. State, 565 So.2d 1197, 1199 (Ala.Crim.App.1990) (reversing vehicular homicide conviction for failure of prosecution to account for blood sample during four-day interval between delivery of unsealed sample to police officer and reception at laboratory). If "`the substance analyzed has passed through several hands the evidence must not leave it to conjecture as to who had it and what was done with it between the taking and the analysis.' Rodgers v. Commonwealth, 197 Va. 527, 90 S.E.2d 257, 260 (1955) (emphasis added)." Suttle, 565 So.2d at 1199.
As Mrs. Green correctly observes, if Dr. Perades drew the samples on June 4, the day of the accident, a significant and unexplained period of time intervened before the shipment arrived in Auburn on June 8, 1988. That fact, coupled with the patent discrepancy in the testimony regarding the content and substance of the samples, leads to conjecture as to whether the samples received in Auburn were, indeed, those taken in Dothan from the body of the decedent, Curtis Green. We, therefore, are not confronted by a chain of custody comprised of "weak links," but by a chain from which links are entirely missing. Ex parte Williams, 548 So.2d 518, 520 (Ala.1989).
Over Mrs. Green's continuing objection, the trial court admitted highly prejudicial evidence regarding the results of the toxicological tests performed on the samples purportedly taken from Curtis Green's body. We conclude that the trial court abused its discretion in admitting the evidence. Therefore, that portion of the judgment based on the jury verdict in favor of APCo and the Town of Slocomb is reversed, and the cause is remanded for retrial as to those defendants.[1] That portion of the judgment based on the directed verdict for Storer is affirmed.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
HORNSBY, C.J., and SHORES, KENNEDY and INGRAM, JJ., concur.
MADDOX, HOUSTON and STEAGALL, JJ., concur in part and dissent in part.
MADDOX, Justice (concurring in part; dissenting in part).
I concur in that portion of the opinion that affirms a portion of the judgment of the trial court, but I must respectfully disagree with that portion of the opinion that holds that, under a totality of the circumstances, defendant Alabama Power Company failed to lay a proper predicate for the admission of the results of the toxicological tests performed on the urine samples taken from Curtis Green's body.
I have read the testimony of Dr. Perades and that of Ms. Shevlin regarding the taking of the urine sample, and I am completely convinced that the trial court did not err in admitting the evidence in this case. Counsel for the plaintiff himself established that the urine sample was taken from Curtis Green. In fact, by cross-examination, counsel for the plaintiff had Dr. Perades identify a picture of Green and testify that his death was caused by electrocution.
The majority, in holding that there was a "missing link" here, quotes from Ex parte Williams, 548 So.2d 518, 520 (Ala.1989), as follows:
"`The purpose for requiring that the chain of custody be shown is to establish *1333 to a reasonable probability that there has been no tampering with the evidence. Williams v. State, 375 So.2d 1257 (Ala.Cr.App.), cert. denied, 375 So.2d 1271 (Ala.1979); Tate v. State, 435 So.2d 190 (Ala.Cr.App.1983); Smith v. State, 446 So.2d 68 (Ala.Cr.App.1984). "The evidence need not negate the most remote possibility of substitution, alteration, or tampering with the evidence, but rather must prove to a reasonable probability that the item is the same as, and not substantially different from, the object as it existed at the beginning of the chain." Slaughter v. State, 411 So.2d 819, 822 (Ala.Cr.App.1981) (emphasis supplied [in Ex parte Williams, 548 So.2d at 520]).'"
The majority claims that it follows and applies the "reasonable probability" rule of Ex parte Williams, 548 So.2d 518, 520 (Ala.1989), but its listing of its reasons shows that it applies a "leads to conjecture" test, not a "reasonable probability" test:
(1) "[I]f Dr. Perades drew the samples on June 4, the day of the accident, a significant and unexplained period of time intervened before the shipment arrived in Auburn on June 8, 1988"; and
(2) "That fact, coupled with the patent discrepancy in the testimony regarding the content and substance of the samples, leads to conjecture as to whether the samples received in Auburn were, indeed, those taken in Dothan from the body of the decedent, Curtis Green."
(Emphasis added.) What is especially troubling about the listing of these reasons for the insufficiency of the predicate is the fact that neither of them is mentioned in the objection made by the plaintiff's counsel at the time the toxicology report was admitted.[2] The fact that Dr. Perades did not testify that he drew a sample of blood is *1334 clearly not a "patent discrepancy," under the facts of this case. Clearly, it was not "patent" enough for counsel to mention it at the time he detailed to the trial court the reasons why he thought there was a break in the chain of custody and was not "patent" enough for counsel to mention it in his initial brief on appeal,[3] and it was mentioned only in a one-sentence reference in his reply brief.
What is most troubling, of course, is that the majority correctly states the rule in the Williams case,[4] but then does not properly apply it. Instead, it applies a "leads to conjecture" test, a test found in a 1955 Virginia case, Rodgers v. Commonwealth, 197 Va. 527, 90 S.E.2d 257 (1955) ("If `the substance analyzed has passed through several hands the evidence must not leave it to conjecture as to who had it and what was done with it between the taking and the analysis'").[5]
The Williams case, cited by the majority, but not followed, says that "[t]he evidence need not negate the most remote possibility of substitution, alteration, or tampering with the evidence, but rather must prove to a reasonable probability that the item is the same as, and not substantially different from, the object as it existed at the beginning of the chain." Quoting Slaughter v. State, 411 So.2d 819 (Ala.Cr.App.1981).
The Williams rule speaks of reasonable probabilities, not possibilities, and clearly *1335 does not contain a "leads to conjecture" test, which the majority applies in this case.
The record in this case shows that there could be no "reasonable probability" that the urine sample that is the subject matter in this case came from the body of someone other than Curtis Green.[6] This record also shows that there could be no "reasonable probability" that the urine sample was tampered with.
In view of the facts in this record showing that Dr. Perades drew the urine sample during an autopsy on the body of Curtis Green, that he sent the samples in a sealed container to the laboratory, that the samples were received at the laboratory, and that they were identified on the paperwork included in the package as being samples from the body of Curtis Green, where is the "missing link"? In order to prove that there is no "missing link" in a case such as this, is it necessary to elicit testimony from each individual with U.P.S. who handles the package? Must the package reach its destination in less than four days? Can a trial court's ruling be reversed on a ground not urged during the trial of the case and not in the original brief, but only in the reply brief?[7]
This judgment should not be reversed. The evidence here just does not show that there was a "reasonable probability" that the urine sample was not placed in the sealed container[8] or that it was tampered with. The fact that there was a four-day interval between the drawing of the urine sample and its arrival at the State forensic lab does not create a reasonable probability that the urine sample was not the same as, and was different from, the object as it existed at the beginning of the chain. The fact that Dr. Perades failed to mention that he also included a sample of Green's blood in the sealed package does not show that there was a "reasonable probability" that the urine sample was tampered with.
In applying the "leads to conjecture" test, the majority necessarily has applied a "remote possibility" test in this case and not the "reasonable probability" test it claims that it applies.[9] Consequently, I must respectfully dissent.
HOUSTON and STEAGALL, JJ., concur.
NOTES
[1] Because we reverse on this ground, we pretermit any discussion of the plaintiff's other assignments of error.
[2] The following objection was made before Shevlin testified:

"MR. STOREY: Your Honor, I think they are getting ready to introduce the [toxicological] analysis report. Ms. Shevlin that was received [sic] at the lab and that these tests were performed on the samples that were sent. We would object to any introduction of that report or any results of these tests on the basis [sic] has failed to lay a proper predicate showing the continuous chain of custody as to both the subject person, which would be the body of Curtis Brown, and the samples taken from that body.
"There has been testimony presented by Dr. Perades that he took samples and that he sent the samples to Auburn and he put them in some containers but there has been no testimony as to the chain of custody of that body from the scene or at least from the hospital. As far as the evidence, there's been no proper chain of custody of the body up to the point that even his blood samples were taken. Even more importantly, there has been no continuous chain of custody as to how these things were mailed or what happened in the meantime. I realize that the cases show that the United States mail is generally considered to be a proper way to mail such as this, maybe even U.P.S. is a proper way. But the cases say that you still have to prove that chain of custody. You can't just say, `we sent it.'
"In the case of Miller v. State [484 So.2d 1203 (Ala.Cr.App.1986) ], in that case it stated that the chain of custody for a sample of the defendant's blood was not adequate where [the] specimen was not placed in the United States mail, but rather regular outgoing mail for the Trooper's Department. To establish a sufficient predicate for admission into evidence, it must be shown that there was no break in the chain of custody. In that particular case the sample was properly packaged as in this particular case, but it was just put in the outgoing mail. Some unknown person probably or possibly took it to the post office and mailed it through the United States mail. Here, we don't even know what occurred in that regard but there are continuous breaks in the body and also as far as the custody of the sample as to what happened to it once it was taken from the body.
"So, we would move to suppress any evidence of any tests or any [toxicological] report that was done by Ms. Shevlin. Thank you.
"MR. COBB: Judge, first of all, Dr. Perades testified that the coronerhe received his instructions from the coroner and labeled it as the body of Curtis Green. He said that. He said that he took the samples from Curtis Green's body himself and he said that they were properly packaged in containers normally used by the Department of Forensic Sciences. This lady has not had the chance yet to testify, and I plan for her to testify, as to what she received from the Department of Forensic Sciences in Dothan in U.P.S. containers normally used by the Department of Forensic Sciences."
After Shevlin testified, counsel made the following objection:
"MR. STOREY: Your Honor, we continue our objection as they have failed to lay a proper predicate showing the continuous chain of custody as to both the subject and also as to the samples taken from that subject prior to the time that it reached Ms. Shevlin.
"THE COURT: Is Robert Byrd going to testify?
"MR. COBB: Judge, we did not subpoena him. However, I understood he was listed on some witness lists that were sent in this case. I'll put it this way, we would certainly do everything that we could to get him here if the Court felt that it was necessary to meet our predicate. However, we feel that we've met our predicate. We could go ahead and take the testimony from Ms. Shevlin with the understanding we will get him here.
"MR. WADDELL: We object to that.
"THE COURT: I overrule the objection."
[3] In her initial brief, the plaintiff argues:

"There is more than one missing link in the present case each of which separately as well as jointly requires a reversal of the judgment below.
"As was testified to by the state toxicologist, Laura Shevlin, she did not know what had happened to the samples before she received them; or who put them in the container in which they were received; or who had turned them over to UPS; or as to the procedure whereby UPS received them; or where they might have been from the time they were taken and the time they were put into the hands of UPS; or as to what medications were administered to Curtis Green at the scene of the accident; or as to whether or not the body had properly been identified as being the body of Curtis Green.
"....
"Not only was there not any testimony in this case by the Coroner, Robert Byrd, or by Dr. Perades' assistant, `Mr. Carpenter[,]' as to the chain of custody and proper identification of the body as being the body of Curtis Green, but Dr. Perades did not testify as to who took the specimens from the laboratory. His only testimony was that he took the specimens from the body and `sent' them to the Department of Forensic Sciences in Auburn `in containers' provided and used by the State of Alabama. In addition to Dr. Perades' not testifying as to how he `sent' the specimens, there is nothing in the record to account for the whereabouts of the specimens between the time they were taken from the body by Dr. Perades and the time they were received by Laura Shevlin. This break in the chain of custody cannot be considered a minor break. Morgan v. State, 570 So.2d 859 (Ala.Crim.App.1990); Suttle v. State, [565 So.2d 1197 (Ala.1990)]; Miller v. State, 484 So.2d 1203 (Ala.Crim.App.1986)."
Not once is there any mention of what the majority classifies as a "patent discrepancy."
[4] The majority holds that "We ... are not confronted by a chain of custody comprised of `weak links,' but by a chain from which links are entirely missing." Williams was a "weak link" case, not a "missing link" case. The Williams rule states that "[t]he evidence need not negate the most remote possibility of substitution, alteration, or tampering with the evidence, but rather must prove to a reasonable probability that the item is the same as, and not substantially different from, the object as it existed at the beginning of the chain." Williams, 548 So.2d at 520. The admission of the evidence in Williams was found not to be erroneous.
[5] There is absolutely no evidence in this case that this sample had "passed through several hands," as was true in Rodgers. The doctor who took the urine sample testified that he took it, put it in a sealed container provided to him by the State of Alabama, and sent it to the State forensic lab. Where is the evidence of the urine sample having "passed through several hands" before it was analyzed?
[6] Dr. Perades testified that he performed the autopsy on Curtis Green's body, and there is no suggestion that the record shows that Dr. Perades did the autopsy on a body other than that of Curtis Green. He stated, without objection, that it was the body of Curtis Green, and plaintiff's counsel himself further identified the body as that of Green when he asked Dr. Perades:

"Q. Dr. Perades, in performing that examination of Curtis Green, did you make a determination as to the cause of death?
"A. Yes, sir, I did.
"Q. What was that determination?
"A. In my opinion, he died from electrocution. He was electrocuted."
The plaintiff's counsel further showed Dr. Perades a picture of Curtis Green, and had him testify about severe burns on Green's body and the location of those burns.
The plaintiff's counsel, in cross-examining Dr. Perades, also established and confirmed Dr. Perades's earlier testimony that he had drawn the samples and had sent them to the State lab:
"Dr. Perades, you said that various samples were taken and sent to Auburn?
"A. Yes, sir.
"Q. Who drew those?
"A. I did.
"Q. You yourself drew them?
"A. Yes."
[7] The so-called "patent discrepancy" the majority finds because Dr. Perades did not mention "blood" as one of the items drawn, was not a ground of counsel's argument at trial or in the plaintiff's initial brief, and was mentioned only in a one-sentence argument in the reply brief on appeal.
[8] Suttle v. State, 565 So.2d 1197 (Ala.Cr.App.1990), cited by the majority in support of its decision, 597 So.2d at 1332, involved an "unsealed sample." (Emphasis added.)
[9] It is obvious that the majority is applying a "remote possibility" test, because it follows Rodgers, the Virginia case, and uses in its opinion the word "conjecture," which was used in that Virginia case.